695 A.2d 236

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. BRIAN
P. HOFFMAN, DEFENDANT–RESPONDENT.

Argued January 21, 1997—Decided June 25, 1997.

566

*James F. Smith,* Assistant Prosecutor, argued the cause for appellant (*Jeffrey S. Blitz,* Atlantic County Prosecutor, attorney; *Jack J. Lipari,* Assistant Prosecutor, on the letter brief).

*Christine M. Cote* argued the cause for respondent (*Cooper Perskie April Niedelman Wagenheim & Levenson,* attorneys).

The opinion of the Court was delivered by

COLEMAN, J.

This is a domestic violence case that raises two significant issues: whether the act of mailing a torn-up support order on two occasions by one former spouse to the other constitutes a violation of the harassment statute, *N.J.S.A.* 2C:33–4(a); and whether the same mailings constitute violations of a final domestic violence restraining order. The trial court held that the act of mailing the torn-up support order violated both statutes. In a published opinion, the Appellate Division concluded that the mailings violated neither statute. 290 *N.J.Super.* 588, 599–601, 676 *A.*2d 565 (1996). A dissenting member of the panel would have affirmed the convictions. *Id.* at 609–12, 676 *A.*2d 565. This appeal is before us as of right. *R.* 2:2–1(a)(2). We now reverse in part and affirm in part.

I

-A-

Defendant Brian P. Hoffman and Mary Hoffman were married for seven years. The family unit included two children born of the marriage and three children from Mary's former marriage. A fire in the marital home in June 1991 forced the family to relocate from Somers Point to Linwood.

Approximately three months after relocating to the Linwood home, defendant commenced a course of conduct that led to the issuance of a final restraining order. In September 1991, defendant was arrested for assaulting Mary during an argument. On September 24, 1991, a temporary restraining order was issued against defendant pursuant to the Prevention of Domestic Violence Act, *N.J.S.A.* 2C:25–1 to –16, which was repealed and replaced by the Prevention of Domestic Violence Act of 1991, *N.J.S.A.* 2C:25–17 to –33 ("1991 Act"). Those charges were dismissed on November 19, 1991, with Mary's consent.

Five days later, defendant and Mary argued again and defendant once again assaulted Mary. She filed a second assault charge

against defendant. On December 19, 1991, Mary again dropped the charges. Although Mary gave a sworn statement that she had not been threatened or coerced into withdrawing the criminal charges, she later informed the Cape May County Prosecutor that she had been coerced into dropping the two assault charges by defendant's threats on her and her children's lives.

Approximately two weeks later, defendant's abusive behavior began once again, and on January 31, 1992, another temporary restraining order was issued pursuant to *N.J.S.A.* 2C:25–28(h). A final restraining order was entered by the Chancery Division, Family Part, on February 6, 1992. The content of that order played a significant role in what was to follow.

That final order (1) prohibited defendant from committing future acts of domestic violence, pursuant to *N.J.S.A.* 2C:25–29(b)(1); (2) prohibited defendant from having contact with Mary and her three children from her prior marriage, pursuant to *N.J.S.A.* 2C:25–29(b)(6); (3) barred defendant from the Somers Point and Linwood homes, pursuant to *N.J.S.A.* 2C:25–29(b)(6); (4) prohibited defendant from making harassing communications to Mary, her three children from the prior marriage, and her mother, pursuant to *N.J.S.A.* 2C:25–29(b)(7); and (5) directed defendant to pay child support, pursuant to *N.J.S.A.* 2C:25–29(b)(4). In addition, the final order awarded Mary exclusive possession of the Linwood home and temporary custody of the two children born of the marriage.

-B-

Although the parties had separated before the end of January 1992, that did not end the alleged pattern of harassing behavior. On February 6, 1992, defendant allegedly violated the final restraining order by surreptitiously entering the Somers Point home. Mary filed a complaint against defendant on April 7, 1992, with the Atlantic County Family Part, charging him with contempt of court, contrary to *N.J.S.A.* 2C:29–9(b), for violating the restraining order. That complaint relied on information that Mary

had received from her next-door neighbor. The neighbor had heard noises from the family home and had gone over to investigate. After the neighbor called out defendant's name several times, defendant allegedly responded "yes—yeah, it's okay." The neighbor also saw defendant's car, a red Volvo, in the driveway.

On February 7, 1992, in an apparent attempt to abide by the restraining order, defendant went to the Linwood home with police escorts to retrieve his belongings. While there, he allegedly destroyed articles of Mary's clothing by ripping or cutting them. Mary did not file charges against defendant for that incident.

On April 16, 1992, defendant again allegedly violated the final restraining order. Mary and her children had gone to the Somers Point home to clean up after the June 1991 fire and to take an inventory. Mary left the children at the home for approximately twenty minutes to drive to her attorney's office to pick up a child support check. As she was returning to the Somers Point home, she noticed defendant's car approximately eight houses from her home, approaching her from the direction of the Somers Point home. Mary became fearful for her children. As the vehicles of defendant and Mary passed each other, defendant slammed on his brakes, appeared to shout something, shook his hand in a fist, and pointed his index finger at her as if he were shooting a gun.

The next day, April 17, 1992, defendant again went to the Somers Point home; only this time he went inside. On that day, the Somers Point police arrested defendant and charged him with burglary, attempted larceny, unlawful possession of a weapon, criminal mischief, and contempt of the final restraining order.

On July 8, 1992, pursuant to a plea agreement, defendant pled guilty in the Law Division to criminal trespass and contempt, two fourth-degree offenses related to the April 17 episode. Other charges related to that episode were dismissed. Defendant was sentenced in August 1992 to three years of probation, and as a condition thereof, he was required to serve 364 days in jail.

Apparently unhappy because defendant had been permitted to plead guilty to the lesser charges for the April 17 episode with a favorable sentence recommendation, Mary filed a municipal court complaint on or about July 9, 1992, charging defendant with harassment for engaging in a course of alarming conduct, in violation of *N.J.S.A.* 2C:33–4(c). Defendant was also charged with contempt for making contact with Mary that was prohibited by the February 6 order, in violation of *N.J.S.A.* 2C:29–9(b). That complaint was related to the April 16 car incident.

While serving the county jail term for the April 17 episode, defendant mailed a package to Mary that she received on June 23, 1993. The envelope contained a Notice of Motion to modify a support order that had been entered a year earlier as part of the couple's divorce proceedings, a financial statement, and a torn-up copy of the support order. The next day, Mary received a notice from the post office informing her that it had a received a piece of certified mail for her. Mary picked up the certified mail on June 25. It contained another torn-up copy of the same support order and the other previously mentioned documents that she had received in the June 23 delivery.

Mary filed two complaints against defendant for the two mailings of the torn-up support order. Each complaint alleged that each of the mailings constituted two distinct offenses: an harassing communication, in violation of *N.J.S.A.* 2C:33–4(a), and contempt for violating the February 6, 1992, final restraining order, a violation of *N.J.S.A.* 2C:29–9(b).

-C-

A bench trial was conducted in the Family Part on August 5, 1993. Four contempt charges, consisting of the two mailings, the February 6, 1992, entry into the Somers Point home, and the April 16, 1992, car incident, were consolidated for trial. Three harassment charges, consisting of the two mailings alleged to be in violation of *N.J.S.A.* 2C:33–4(a) and the April 16, 1992, car incident

alleged to be in violation of *N.J.S.A.* 2C:33–4(c), were also consolidated for trial.

The trial court found Mary to be an "extremely credible" witness and, on the basis of her testimony, concluded that the incidents of April 16, 1992, and the June 23 and June 25, 1993, mailings had occurred as she had reported them. However, the trial court granted defendant's motion for a directed verdict on the contempt charge for violating the final restraining order based on defendant's February 6 entry into the Somers Point home. The motion was granted because the court was not convinced beyond a reasonable doubt that defendant had entered the Somers Point home on that date. The trial court also acquitted defendant of the harassment charge related to the April 16 event. The court interpreted *N.J.S.A.* 2C:33–4(c) to require more than a single episodic act. It considered defendant's gesture with his hand and finger from his automobile to constitute a single act rather than a course of conduct that it deemed was required by *N.J.S.A.* 2C:33–4(c).

The trial court convicted defendant of the remaining five charges: the contempt charge relating to the April 16 incident; the charges of contempt and harassment for the June 23 mailing; and the charges of contempt and harassment for the June 25 mailing.

For sentencing purposes, the trial court merged defendant's harassment convictions with the accompanying contempt convictions related to the two mailings and sentenced him to concurrent terms of thirty days in the Atlantic County Justice Facility. For the April 16 contempt conviction, defendant was sentenced to the same facility for a concurrent term of six months.

The Appellate Division affirmed defendant's conviction and sentence for contempt based on the April 16 incident. 290 *N.J.Super.* at 601, 676 *A.*2d 565. It reversed the two harassment and the two contempt convictions relating to the two mailings. *Id.* at 599–601, 676 *A.*2d 565.

The majority held that the two mailings did not constitute harassment within the meaning of *N.J.S.A.* 2C:33-4(a) because the mailings were not likely to alarm or to seriously annoy Mary or a reasonable person. 290 *N.J.Super.* at 599, 676 *A.2d* 565. The majority vacated the two contempt convictions because the controlling language in the contempt statute is the same as the controlling language in the harassment statute. *Id.* at 600-01, 676 *A.2d* 565. The dissent disagreed, finding that the two mailings satisfied the requirements of both statutes. *Id.* at 612, 676 *A.2d* 565. The State has appealed of right based on the dissent.

## II

### -A-

The State argues that the majority of the Appellate Division panel incorrectly construed as equivalents the harassment statutory terms "annoyance" and "alarm." The State relies on the plain language of the terms "annoy" and "alarm" and distinguishes them by degrees of fear. The State maintains that the majority erred by failing to examine and apply the statutes in light of the legislative objective embodied in the 1991 Act.

Defendant contends that the majority opinion construed the harassment statute to require serious annoyance under subsection (a) because without such a construction the statute would be void for vagueness, thereby rendering it unconstitutional. He contends that if the Court finds that the majority erred in its construction of the statute, then the Court should declare the statute unconstitutional. We find that the principal issue before us, the issue that divided the Appellate Division, whether a "serious" annoyance must be found under subsection (a), is the wrong issue upon which to focus. The proper focus in a subsection (a) prosecution should be on whether the method or manner of communication established an harassing intent to annoy or alarm.

-B-

A determination of whether the two mailings constitute harassment must begin with the statutory language. The harassment statute provides in relevant part:

[A] person commits a petty disorderly persons offense if, with purpose to harass another, he:

a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or *any other manner likely to cause annoyance or alarm;*

b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or *seriously* annoy such other person.

A communication under subsection a. may be deemed to have been made either at the place where it originated or at the place where it was received.

[*N.J.S.A.* 2C:33–4 (emphasis added).]

Each of those three subsections is "free-standing, because each defines an offense in its own right." *State v. Mortimer,* 135 *N.J.* 517, 525, 641 *A.*2d 257 (1994). The plain language of subsection (a) provides that a person commits a petty disorderly persons offense if he or she communicates in a "manner likely to cause annoyance or alarm." *N.J.S.A.* 2C:33–4(a). A violation of subsection (a) requires the following elements: (1) defendant made or caused to be made a communication; (2) defendant's purpose in making or causing the communication to be made was to harass another person; and (3) the communication was in one of the specified manners or any other manner similarly likely to cause annoyance or alarm to its intended recipient.

The purpose to be served by enactment of the harassment statute is to make criminal, private annoyances that are not entitled to constitutional protection. 2 *Final Report of the New Jersey Criminal Law Revision Commission,* commentary to § 2C:33–4, at 296 (1971) (*"Final Report"*). Thus, the substantive criminal offense proscribed by subsection (a) "is directed at the purpose behind and motivation for" making or causing the communication to be made. *Mortimer, supra,* 135 *N.J.* at 528, 641 *A.*2d 257.

It is undisputed that defendant mailed the two communications to Mary. The State was required to prove beyond a reasonable doubt that defendant's purpose in mailing the communications was to harass Mary. *E.K. v. G.K.*, 241 *N.J.Super.* 567, 570, 575 *A.*2d 883 (App.Div.1990). The New Jersey Code of Criminal Justice defines "purposely" as follows: "A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result." *N.J.S.A.* 2C:2–2(b)(1). The trial court found that defendant had acted with the purpose to harass Mary, reasoning that there was no other purpose for defendant to mail torn-up copies of the order.

A finding of a purpose to harass may be inferred from the evidence presented. *State v. McDougald*, 120 *N.J.* 523, 566–67, 577 *A.*2d 419 (1990); *State v. Avena*, 281 *N.J.Super.* 327, 340, 657 *A.*2d 883 (App.Div.1995). Common sense and experience may inform that determination. *State v. Richards*, 155 *N.J.Super.* 106, 118, 382 *A.*2d 407 (App.Div.), *certif. denied*, 77 *N.J.* 478, 391 *A.*2d 493 (1978).

Our review of the record reveals a substantial evidentiary basis to support the trial court's finding that defendant's purpose was to harass Mary. The mailings of the torn-up copy served no legitimate purpose. Inclusion of the previous support order, torn-up or otherwise, was not necessary for defendant to inform Mary of his motion to modify the support order. As the custodial parent, Mary was fully aware of the terms of the support order. Absent a legitimate purpose behind defendant's actions, the trial court could reasonably infer that defendant acted with the purpose to harass Mary.

The third and crucial element of harassment under subsection (a), namely whether the two mailings were in a "manner likely to cause annoyance or alarm" to Mary, is more problematic. *N.J.S.A.* 2C:33–4(a). Because subsection (a) uses no adjective to quantify the degree of annoyance required, the majority in the

Appellate Division held that the annoyance must be serious. It reasoned that the Legislature did not intend to "criminalize irksome or vexing communications." 290 *N.J.Super.* at 598–99, 676 *A.*2d 565. We disagree with the Appellate Division that the "serious annoyance" required by subsection (c) must be engrafted into the "annoyance" required under subsection (a).

■ When construing a statute, the first consideration is the statute's plain meaning. *State v. Szemple,* 135 *N.J.* 406, 421, 640 *A.*2d 817 (1994); *Merin v. Maglaki,* 126 *N.J.* 430, 434, 599 *A.*2d 1256 (1992); *Town of Morristown v. Woman's Club,* 124 *N.J.* 605, 610, 592 *A.*2d 216 (1991). If differing interpretations exist, then the phrase's meaning is not obvious or self-evident on its face. *Szemple, supra,* 135 *N.J.* at 422, 640 *A.*2d 817. When a statute is ambiguous, a court's function is to ascertain and to effectuate the Legislature's intent. *Szemple, supra,* 135 *N.J.* at 422, 640 *A.*2d 817 (citing *Cedar Cove, Inc. v. Stanzione,* 122 *N.J.* 202, 213, 584 *A.*2d 784 (1991)). Extrinsic aids, such as legislative history, committee reports, and contemporaneous construction, may be used to help resolve any ambiguity and to ascertain the true intent of the Legislature. *Ibid.*

"The primary task for the Court is to 'effectuate the legislative intent in light of the language used and the objects sought to be achieved.'" *Merin, supra,* 126 *N.J.* at 435, 599 *A.*2d 1256 (quoting *State v. Maguire,* 84 *N.J.* 508, 514, 423 *A.*2d 294 (1980)); *see Richard's Auto City, Inc. v. Director, Div. of Taxation,* 140 *N.J.* 523, 533, 659 *A.*2d 1360 (1995). As we noted earlier, when enacting *N.J.S.A.* 2C:33–4, the Legislature sought to fill gaps in the Code of Criminal Justice. 2 *Final Report, supra,* commentary to § 2C:33–4, at 296. The commentary to the *Final Report* states:

Special provision for these private annoyances is required since Section 2C:33–2 (Disorderly Conduct) is limited to disturbance of some general impact [as opposed to impact on a particular individual]. The present Section is also needed to fill a gap caused by some exclusions from the provisions of Section 2C:12–1 (Assaults).

[*Ibid.*]

Two repealed statutes, *N.J.S.A.* 2A:170–26 and *N.J.S.A.* 2A:170–29, served as sources for *N.J.S.A.* 2C:33–4. *See* 2 *Final Report,*

*supra,* commentary to § 2C:33–4, at 296; *L.* 1978, *c.* 95, § 2C:33–4. *N.J.S.A.* 2A:170–26 addressed assaultive behavior. *N.J.S.A.* 2A:170–29 prohibited among other things, public utterances of loud and offensive or profane language, and public or private harassing telephone calls.

The final source for *N.J.S.A.* 2C:33–4 was the American Law Institute's *Model Penal Code* ("MPC") § 250.4. 1 *Final Report, supra,* source or reference note to § 2C:33–4, at 113. The commentary to *MPC* § 250.4 states that that section applies to harassment of another individual. *Model Penal Code and Commentaries* § 250.4, cmt. 1, at 360 (Official Draft and Revised Comments 1980) (*"MPCC"*). The MPC, however, did not include the term "annoy" in its text. *Id.* at 359–60. In defining a "prohibited course of alarming conduct" (currently prohibited by *N.J.S.A.* 2C:33–4(c)), the commentary to the MPC states, "[a]larm, of course, may be induced in an infinite variety of ways, but the requirement excludes from the offense actions not productive of anxiety or distress." *MPCC, supra,* § 250.4, cmt. 5, at 368.

■ Ordinarily, the legislative history can be very helpful in determining legislative intent. Here, however, the Legislature when enacting *N.J.S.A.* 2C:33–4 did not explicitly state its intent concerning the term "annoy"; therefore, the legislative history is not particularly helpful in ascertaining the meaning of the terms "annoy" and "alarm" as codified in *N.J.S.A.* 2C:33–4(a). As the dissenting opinion noted, *N.J.S.A.* 2C:33–4(a) does not modify the verb "annoy" with the adverb "seriously." 290 *N.J.Super.* at 609, 676 *A.*2d 565. A familiar principle of statutory construction precludes the Court from engrafting the term "serious" found in subsection (c) into subsection (a) because the Legislature carefully employed it in subsection (c) and excluded it in subsection (a), thereby indicating that the exclusion was intentional. *See GE Solid State, Inc. v. Director, Div. of Taxation,* 132 *N.J.* 298, 308, 625 *A.*2d 468 (1993); *Marshall v. Western Union Tel. Co.,* 621 *F.*2d 1246, 1251 (3d Cir.1980). Moreover, the Legislature intend-

ed for each subsection of the harassment statute to be free-standing. *See Mortimer, supra,* 135 *N.J.* at 525, 641 *A.*2d 257.

█ Consequently, the words and phrases used by the Legislature should be accorded their normal and accepted connotations as well as their ordinary and well understood meanings. *Fahey v. Jersey City,* 52 *N.J.* 103, 107, 244 *A.*2d 97 (1968); *State v. Sperry & Hutchinson Co.,* 23 *N.J.* 38, 46, 127 *A.*2d 169 (1956). One dictionary defines "to annoy" as "to interfere with[, to] affect detrimentally ... [,] to be a source of annoyance ... [; annoy] suggests disturbed or irritated loss of composure, placidity, or patience through enduring affliction, ... slight, or discomfort." *Webster's Third New International Dictionary* 87 (1993) ("*Webster's* "). Another dictionary defines "annoy" as "[t]o disturb or irritate, especially by continued or repeated acts; to weary or trouble; to irk; to offend." *Black's Law Dictionary* 89 (6th ed.1990).

█ We are satisfied that the Legislature intended that the term "annoyance" should derive its meaning from the conduct being scrutinized. As will be developed more fully later, subsection (a) proscribes a single act of communicative conduct when its purpose is to harass. Under that subsection, annoyance means to disturb, irritate, or bother. Subsection (b) (the assault and battery or physical contact harassment section) deals with touchings or threats to touch, and it does not require the intended victim to be annoyed or alarmed. In contrast to subsection (a), which targets a single communication, subsection (c) targets a course of conduct. Subsection (c) proscribes a course of alarming conduct or repeated acts with a purpose to alarm or seriously annoy an intended victim.

The purpose of subsection (c) is to reach conduct not covered by subsections (a) and (b). For example, if a person were to ring a former companion's doorbell at 3:00 p.m. on Sunday, flash bright lights into her windows on Monday at 6:00 p.m., throw tomatoes into her front door on Tuesday at 6:30 p.m., throw eggs on her car on Wednesday, and repeat the same conduct over a two-week

period, a judge could find that subsection (c) has been violated. We do not imply by that example that five or more episodes are required to establish a course of alarming conduct. That determination must be made on a case-by-case basis. We conclude only that serious annoyance under subsection (c) means to weary, worry, trouble, or offend.

Thus, the difference between "annoyance" and "serious annoyance" is a matter of degree. That is a choice that the Legislature is free to make. The judiciary does not have a license to rewrite legislation to make it conform to its wishes. *State v. Muhammad,* 145 *N.J.* 23, 40, 678 *A.*2d 164 (1996). The Legislature has made the conscious choice that the level of annoyance caused by communications directed to a person with purpose to harass need not be as serious as that required by subsection (c). The Legislature no doubt felt that because of the widespread use of some forms of communication to harass people, the impact upon the intended victim should not have to be as severe to sustain a violation of subsection (a) as that required by subsection (c).

-C-

Although we hold that the annoyance or alarm required by subsection (a) need not be serious, the catchall provision of subsection (a) must be interpreted to protect against unconstitutional vagueness and impermissible restrictions on speech. Defendant maintains that if subsection (a) does not require serious annoyance, then that subsection fails the constitutional vagueness test.

A statute that is vague creates a denial of due process because of a failure to provide notice and warning to an individual that his or her conduct could subject that individual to criminal or quasi-criminal prosecution. *Screws v. United States,* 325 *U.S.* 91, 101–02, 65 *S.Ct.* 1031, 1035, 89 *L.Ed.* 1495, 1503 (1945). This Court has stated that

"[c]lear and comprehensible legislation is a fundamental prerequisite of due process of law, especially where criminal responsibility is involved. Vague laws are

unconstitutional even if they fail to touch constitutionally protected conduct, because *unclear or incomprehensible legislation places both citizens and law enforcement officials in an untenable position.* Vague laws deprive citizens of adequate notice of proscribed conduct, and fail to provide officials with guidelines sufficient to prevent arbitrary and erratic enforcement."

[*State v. Afanador,* 134 N.J. 162, 170, 631 A.2d 946 (1993) (alteration in original) (quoting *Town Tobacconist v. Kimmelman,* 94 N.J. 85, 118, 462 A.2d 573 (1983)) (emphasis added).]

■ We reject defendant's vagueness argument and reaffirm our decision in *Mortimer, supra,* 135 *N.J.* at 536, 641 A.2d 257, holding that *N.J.S.A.* 2C:33–4(a) is not unconstitutionally vague. The specific state of mind required, with purpose to harass the intended recipient of the communication, is sufficiently clear and serves to clarify any vague phrases in subsection (a). The ordinary usage of the term "harass" is sufficient to inform a person of normal intelligence of the type of mental culpability needed. As was stated in *Mortimer,* the phrases in the statute when read in isolation may be vague, but subsection (a) is not vague because each communication is subject to the requirement that there be a purpose to harass. *Mortimer, supra,* 135 *N.J.* at 535–36, 641 A.2d 257.

■ Independent of, and yet related to, the vagueness argument is the problem of how to interpret the phrase "any other manner" of communication contained in the catchall provision of subsection (a). If possible, we should interpret that phrase in a way that avoids successful overbreadth challenges. An overbreadth challenge may be successful where there is "a strong showing that the statute's deterrent effect on legitimate expression is ... real and substantial ... and that the sweep of the legislation will impermissibly hobble the exercise of protected First Amendment rights." *New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n,* 82 *N.J.* 57, 66, 411 A.2d 168 (1980) (citations omitted) (internal quotation marks omitted); *State v. Finance Am. Corp.,* 182 *N.J.Super.* 33, 37, 440 A.2d 28 (App.Div.1981).

■ Clearly the two mailings were not sent anonymously, or at an extremely inconvenient hour, or in offensively coarse language, all of which are proscribed by subsection (a). Those three types of communication properly can be classified as being invasive of the recipient's privacy. Thus, we believe the Legislature intended that the catchall provision of subsection (a) encompass only those types of communications that also are invasive of the recipient's privacy.

As we noted earlier, subsection (a) is similar to *MPC* § 250.4(3). As the Model Penal Code Commentary to this section notes, the First Amendment is implicated since the provision proscribes harassment by communication. The Commentary notes that this particular provision (*N.J.S.A.* 2C:33–4a or § 250.4(3)) presents a difficult overbreadth issue. Although the principal application of this section is to harassing phone calls, it has been applied in other contexts. In light of the Supreme Court's decision in *Rowan v. Post Office Dept.*, 397 *U.S.* 728, 90 *S.Ct.* 1484, 25 *L.Ed.*2d 736 (1970), the Commentary notes that "Subsection (3) should perhaps be interpreted to apply only to repeated phone calls or other kinds of communicative harassment that intrude into an individual's legitimate expectation of privacy." *Model Penal Code and Commentaries* § 250.4, at 372–374 (Official Draft and Revised Comments 1980).

[*Roe v. Roe*, 253 *N.J.Super.* 418, 429 n. 3, 601 *A.2d* 1201 (App.Div.1992).]

The catchall provision of *N.J.S.A.* 2C:33–4(a) should generally be interpreted to apply to modes of communicative harassment that intrude into an individual's "legitimate expectation of privacy." *MPCC, supra*, § 250.4, cmt. 6, at 374. Many forms of speech, oral or written, are intended to annoy. Letters to the editor of a newspaper are sometimes intended to annoy their subjects. We do not criminalize such speech, even if intended to annoy, because the manner of speech is non-intrusive.

■ Thus, in enforcing subsection (a) of the harassment statute, we must focus on the mode of speech employed. That subsection of our statute, like those elsewhere, is "aimed, not at the content of the offending statements but rather at the manner in which they were communicated." *Finance Am. Corp., supra*, 182 *N.J.Super.* at 39–40, 440 *A.2d* 28. Speech that does not invade one's privacy by its anonymity, offensive coarseness, or extreme inconvenience does not lose constitutional protection even

when it is annoying. Because subsection (a) has criminalized communications that are made anonymously or in offensively coarse language or at extremely inconvenient hours, we assume that the Legislature did not intend to criminalize communications under subsection (a) that are made in inoffensive language, at convenient hours, or in the communicator's own name.

That conclusion is consistent with the *ejusdem generis* principle of statutory interpretation. *See* 2A *Norman J. Singer, Sutherland Statutory Construction* § 47.17 (5th ed.1992).

Under this rule, when general words follow specific words in a statutory enumeration, the general words are construed to embrace only the objects similar in nature to those objects enumerated by the preceding specific words. This technique saves the legislature from spelling out in advance every contingency in which the statute could apply.

[*Hovbilt, Inc. v. Township of Howell,* 263 *N.J.Super.* 567, 571, 623 *A.*2d 770 (App.Div.1993) (citations omitted), *aff'd,* 138 *N.J.* 598, 651 *A.*2d 77 (1994).]

Although we hold that defendant was improperly convicted under subsection (a) because those mailings did not invade Mary's privacy so as to constitute harassment, we emphasize that the trial court is permitted to examine the totality of the circumstances, especially and including the context of domestic violence, in determining whether subsection (a) has been violated. Our law is particularly solicitous of victims of domestic violence, and the 1991 Act therefore influences our interpretation of the harassment statute. *See N.J.S.A.* 2C:25–18 (providing that the purpose of the 1991 Act is to assure the victims of domestic violence "the maximum protection from abuse the law can provide").

At its core, the 1991 Act effectuates the notion that the victim of domestic violence is entitled to be left alone. To be left alone is, in essence, the basic protection the law seeks to assure these victims. *Cf. State v. Mosch,* 214 *N.J.Super.* 457, 466, 519 *A.*2d 937 (App. Div.1986) ("The scales of justice remind us that the public as well as this victim have a right to feel safe when alone in their own homes. Since the incident here occurred, D.D. has been afraid to leave her apartment, afraid to be left alone and, even worse, afraid to walk around her own apartment. Each and every one of us has

the fundamental right to be left alone."), *certif. denied,* 107 *N.J.* 131, 526 *A.*2d 197 (1987). Thus, we are persuaded that the Legislature intended that although conduct or speech that may not sufficiently constitute an invasion of privacy to the non-victim, may in fact constitute harassment to the victim of past domestic abuse.

 In determining whether a defendant's conduct is likely to cause the required annoyance or alarm to the victim, that defendant's past conduct toward the victim and the relationship's history must be taken into account. The incidents under scrutiny must be examined in light of the totality of the circumstances.

This is particularly true in domestic violence cases in which a cycle of violent behavior is evident. Indeed, courts are required to consider "[t]he previous history of domestic violence between the [parties], including threats, harassment and physical abuse" when determining whether the 1991 Act has been violated. *N.J.S.A.* 2C:25–29(a)(1). As was demonstrated here, those who commit acts of domestic violence have an unhealthy need to control and dominate their partners and frequently do not stop their abusive behavior despite a court order. *See* James Martin Truss, *The Subjection of Women ... Still: Unfulfilled Promises of Protection for Women Victims of Domestic Violence,* 26 *St. Mary's L.J.* 1149, 1172–73 (1995); Dennis Hevesi, *For the Abused, An Electronic Lifeline, N.Y. Times,* July 27, 1995, at B3. Victims are actually at their highest risk of injury when they try to leave their abusers. *See* Truss, *supra,* 26 *St. Mary's L.J.* at 1172–73; Barbara Stewart, *What Drives a Batterer? Issues of Control, N.Y. Times,* Nov. 3, 1996, at NJ4. Domestic violence victims who leave their abusers are justified in their continued fear because of the many cases of victims who are assaulted or killed by former partners.

The trial court appropriately observed that defendant had a history of committing acts of domestic violence against Mary and of violating the restraining order. The trial court correctly found that defendant had no purpose other than to harass Mary in

mailing the torn-up orders. Mary was unaware of any legitimate function that was served by the torn-up orders; that made her more likely to feel alarmed or annoyed. An abuser who spontaneously appears or makes surprising communications without any legitimate purpose enhances the victim's apprehension. The fears of a domestic violence victim and the turmoil she or he has experienced should not be trivialized. In different contexts, a recipient of a torn-up court order may not be alarmed or seriously annoyed, but some victims of domestic violence may rightly view a course of communicative conduct as seriously annoying, alarming, or threatening, or as all of those things.

Based on the final restraining order that was issued pursuant to the 1991 Act, the trial court found that viewing the four contempt charges and the three harassment charges collectively made Mary fearful of defendant. The court also considered the fact that when defendant mailed the ripped-up court orders, he was in jail serving time for conduct that became criminal by virtue of the final restraining order that was issued at the behest of Mary.

-D-

We recognize that in the area of domestic violence, as in some other areas in our law, some people may attempt to use the process as a sword rather than as a shield. The judicial system must once again rely on the trial courts as the gatekeeper. The Legislature has established a self-regulating provision in the Code that can be used to protect against frivolous prosecutions under the 1991 Act. The gap-filler measure is the *de minimis* infraction provision, *N.J.S.A.* 2C:2–11. It provides:

> The assignment judge may dismiss a prosecution if, having regard to the nature of the conduct charged to constitute an offense and the nature of the attendant circumstances, it finds that the defendant's conduct:
>
> a. Was within a customary license or tolerance, neither expressly negated by the person whose interest was infringed nor inconsistent with the purpose of the law defining the offense;
>
> b. Did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or

c. Presents such other extenuations that it cannot reasonably be regarded as envisaged by the Legislature in forbidding the offense. The assignment judge shall not dismiss a prosecution under this section without giving the prosecutor notice and an opportunity to be heard. The prosecutor shall have a right to appeal any such dismissal.

[*N.J.S.A.* 2C:2–11.]

The statute, with modifications, was modeled after *MPC* § 2.12. 1 *Final Report, supra,* source or reference note to § 2C:2–11, at 23. The drafters of the *MPC* summarized the historical basis for that section as a "kind of unarticulated authority to mitigate the general provisions of the criminal law to prevent absurd applications." 2 *Final Report, supra,* commentary to 2C:2–11, at 74. Our courts have not hesitated to use that statute to terminate a potential prosecution when the charge has been trivial or the prosecution would have been absurd. *State v. Brown,* 188 *N.J.Super.* 656, 671, 458 *A.2d* 165 (Law Div.1983); *see, e.g., State v. Zarrilli,* 216 *N.J.Super.* 231, 240, 523 *A.2d* 284 (Law Div.) (dismissing charge of underage consumption of alcoholic beverage where the defendant took a sip of a friend's beer), *aff'd,* 220 *N.J.Super.* 517, 532 *A.2d* 1131 (App.Div.1987); *State v. Nevens,* 197 *N.J.Super.* 531, 534, 485 *A.2d* 345 (Law Div.1984) (dismissing theft charge stemming from the defendant's taking of a few pieces of fruit from a buffet table); *State v. Smith,* 195 *N.J.Super.* 468, 477, 480 *A.2d* 236 (Law Div.1984) (stating that statute avoids an injustice "in a case of technical but trivial guilt").

III

Next, we turn to the question whether defendant violated the contempt statute by the two mailings. *N.J.S.A.* 2C:25–29(b) of the 1991 Act provides that a court "may issue an order granting any or all of the" listed relief provided by the statute. *Ibid.* As noted earlier, the final restraining order of February 6, 1992, prohibited defendant from having contact with Mary and his three stepchildren, and from making harassing communications to Mary, defendant's stepchildren, and Mary's mother.

The trial court cited *N.J.S.A.* 2C:25–29(b)(6) in concluding that defendant had violated the restraining order by the two mailings. *N.J.S.A.* 2C:25–29(b)(6) allows

[a]n order restraining the defendant from entering the residence, property, school, or place of employment of the victim or of other family or household members of the victim and requiring the defendant to stay away from any specified place that is named in the order and is frequented regularly by the victim or other family or household members.

*[Ibid.]*

The Appellate Division disagreed with the trial court and concluded that subsection (6) could not be the basis of a finding that the mailings constituted contempt violations. The Appellate Division reasoned that subsection (6) only prohibits defendants from physically entering certain locations, not communications by telephone or mail. Instead, the Appellate Division found that subsection (7) would be the more appropriate section for the inquiry.

The version of *N.J.S.A.* 2C:25–29(b)(7) applicable to this case stated:

[a]n order restraining the defendant from making any communication likely to cause annoyance or alarm including, but not limited to, personal, written, or telephone contact with the victim or other family members, or their employers, employees, or fellow workers, or others with whom communication would be likely to cause annoyance or alarm to the victim.

[*L.*1991, *c.* 261, § 13, *amended by L.* 1994, *c.* 94, § 5.] [1]

In finding no violation of the contempt statute, the Appellate Division explained that

[t]his is the same standard as is contained in the harassment statute. Because we have concluded that the communications of June 23 and June 25 were not likely to

---

[1] The current version of *N.J.S A.*2C:25–29(b)(7) provides:

[a]n order restraining the defendant from making *contact with the plaintiff or others, including an order forbidding the defendant from personally or through an agent initiating* any communication likely to cause annoyance or alarm including, but not limited to, personal, written, or telephone contact with the victim or other family members, or their employers, employees, or fellow workers, or others with whom communication would be likely to cause annoyance or alarm to the victim.

*[Ibid.* (emphasis added).]

cause annoyance or alarm under *N.J.S.A.* 2C:33–4(a) it follows that defendant could not have violated the terms of the restraining order by those mailings.

[290 *N.J.Super.* at 601, 676 *A.*2d 565.]

■ We disagree with the conclusion that a finding that subsection (a) was not violated is dispositive of whether the contempt convictions can stand.

Subsections (a), (b), and (c) harassments are petty disorderly persons offenses. *N.J.S.A.* 2C:33–4. A contempt for violating a domestic violence restraining order may be either a fourth-degree offense or a disorderly persons offense. *N.J.S.A.* 2C:29–9(a). It is a fourth-degree offense if the conduct constituting the violation of the court order could itself also constitute a crime or a disorderly persons offense. *N.J.S.A.* 2C:29–9(b). In all other cases, a contempt based on a violation of a domestic violence restraining order is a disorderly persons offense unless the conduct is expressly exempt by statute. *Ibid.*

In the present case, the permanent restraining order prohibited defendant from (1) engaging in further acts of domestic violence, (2) having contact with Mary, the stepchildren, and Mary's mother, or having contact with them by visiting at either of the two homes except as provided in the order, and (3) making harassing communications to Mary, the stepchildren, and Mary's mother. *N.J.S.A.* 2C:25–29(b)(1), (6), and (7).

■ Despite the trial court's reference to *N.J.S.A.* 2C:25–29(b)(6) and the fact that *N.J.S.A.* 2C:25–29(b)(7) was not amended until 1994, the permanent restraining order entered on February 6, 1992, "prohibited defendant from having contact with" Mary except as otherwise provided in that order. Defendant was also restrained from communicating with Mary for the purpose of harassing her. As the trial court found, sending the two mailings were written contacts with Mary in violation of the restraining order.

■ The provision in the restraining order that prohibited defendant from contacting Mary except as authorized by the order

was not *ultra vires* before the 1994 amendment modifying *N.J.S.A.* 2C:25–29(b)(7). The Legislature expressed the clear intent in the 1991 Act that the judiciary should provide the maximum protection to victims of domestic violence. Indeed, the first sentence of *N.J.S.A.* 2C:25–29(b) authorizes the trial court to "grant any relief necessary to prevent further abuse." *Ibid.* Consistent with that intent, the Appellate Division has upheld a contempt conviction for violating a provision in a 1993 restraining order that prohibited the defendant from "having contact" with a victim. *State v. L.C.*, 283 *N.J.Super.* 441, 445–47, 662 *A.*2d 577 (1995), *certif. denied*, 143 *N.J.* 325, 670 *A.*2d 1066 (1996).

The primary purpose for tying the contempt conviction to criminal conduct is to elevate the seriousness of the contempt from a disorderly persons offense to a fourth-degree crime. However, sentence enhancement was not relevant in this case. Even a conviction for violating the harassment statute, which would be a petty disorderly persons offense, would not elevate the contempt convictions.

## IV

We reverse the judgment of the Appellate Division and hold that the two mailings violated the permanent restraining order. We affirm the judgment of the Appellate Division that the two mailings did not violate *N.J.S.A.* 2C:33–4(a). Because the sentences for the subject harassment and contempt convictions were concurrent, no resentencing is required. The final judgment, however, should be amended to conform to this opinion.

*Affirmance in part; reversal in part*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.