# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2725-23

N.R.,[1]

    Plaintiff-Respondent,

v.

B.S.R.,

    Defendant-Appellant.

_____

        Submitted December 18, 2024 – Decided April 10, 2025

        Before Judges Paganelli and Torregrossa-O'Connor.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-0183-24.

        B.S.R., appellant pro se.

        Respondent has not filed a brief.

PER CURIAM

---

[1] We use initials or party designations to protect the confidentiality of the victim in these proceedings. R. 1:38-3(d)(10).

Defendant, B.S.R., appeals from a March 20, 2024 final restraining order (FRO) entered against him protecting plaintiff, N.R., pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Because the trial court's finding of the predicate act of harassment and the need for an FRO was grounded in substantial, credible evidence in the record, we affirm.

I.

The following facts are derived from the FRO trial in which defendant was represented by counsel and plaintiff proceeded pro se. Plaintiff was the sole witness.

A.

At the time of the FRO hearing, the parties had been married for seventeen years and were pursuing a divorce. They share a minor child, born in 2011. On July 12, 2023, plaintiff obtained a temporary restraining order (TRO), alleging that defendant harassed her by contacting her repeatedly by text and telephone—continuing a pattern of prior abuse. She subsequently amended the TRO to add a claim that "defendant filed an emergent application with the family court," incorporating "defamatory allegations" without proof and "traumatizing" her. Plaintiff also alleged defendant, although incarcerated in Pennsylvania, was

utilizing his "[p]ower of [a]ttorney" "to stalk [her] accounts," and enlisting others to surveil her home and her child's school.

At the hearing, plaintiff described a history of past abuse including an alleged September 2022 incident, during which defendant attacked her physically. Plaintiff explained she "ha[s] scars on [her] skin" from that incident during which he choked her and dragged her by her hair from outside into the house. She presented photographs depicting her injuries, that she testified resulted from defendant "pulling out [her] hair" from "the nape of [her] neck," "hit[ting her] in [her] face" by her lower left eyelid, and "put[ting her] in [a] headlock." Defendant objected to the admission of the photographs, asserting they were not properly authenticated, but plaintiff stated she took the photos, which fairly and accurately depicted her injuries resulting from defendant's attack. The court overruled the objection and admitted the photos into evidence.

She testified that in March 2023 a victim advocacy group in Pennsylvania issued "a cease[-]and[-]desist order," directing defendant to cease all communication with plaintiff, after defendant expressed "[v]ery horrible things" about her in multiple letters. Plaintiff was unable to properly authenticate an April 19, 2023 letter from the Pennsylvania Department of Corrections, where

defendant was housed, acknowledging the protective order, but the court accepted her testimony regarding the prior restriction on contact with her.

Plaintiff also alleged that between January and April 2023, police performed numerous wellness checks at her residence initiated by defendant. Plaintiff testified that in January 2023, she observed through her Ring security camera footage of police shining flashlights into her home and later learned the officers were looking for her and her son to ensure their safety. She testified another visit involved police officers "banging on the door," leaving her son "traumatized." After filing a complaint with police, plaintiff learned that defendant's nephew made the calls.

Plaintiff indicated that during that time she filed a lawsuit seeking to evict defendant's mother as a tenant from the parties' property. Plaintiff claimed defendant used his power of attorney to make his mother part-owner, resulting in dismissal of the suit. She cited this as another instance of defendant attempting to control her life despite being incarcerated.

Plaintiff testified that in June 2023, defendant called the parties' son from the prison facility, and she heard defendant "yelling and cursing" at him, ultimately causing him to cry. Plaintiff admitted she attempted to visit defendant with her son on one occasion despite the cease-and-desist order but

explained she did so to allow her son to see his father.  She stated the facility did not allow them to visit defendant due to the no-contact order.

Plaintiff also claimed that on November 29, 2023, to further harass her, defendant filed an application against her in family court, which was later dismissed.  She explained that defendant falsely alleged she was a prostitute with an OnlyFans account, and her "Tik[]Tok [wa]s a prostituting website." Plaintiff emphasized defendant did this while still incarcerated, expressing "fear[] of what he would do outside with no restraints."

Plaintiff further testified that defendant, through a mobile application provided by the correctional facility, transmitted multiple "horrible" messages, calling plaintiff a "whore," accusing her of "sleeping around with his friends," and telling plaintiff she "wouldn't get anywhere without him, that [she will] regret this."  The court admitted into evidence screenshots of the messages sent to her on June 30 and July 10 over defendant's objection after plaintiff explained how the mobile application worked and that these were true and accurate depictions of the messages.  Defendant did not dispute that he sent the messages, instead contending that some of the messages were "cherry-picked" and incomplete and only contained a portion of the conversation.  Defendant did not offer the allegedly omitted portions of the conversation.

5

In the messages defendant disparaged plaintiff, calling her a "clown" and "dummy," and claiming she was "suffering from a mental disorder." Defendant sent another message threatening to send the police to the home of someone close to plaintiff after accusing plaintiff of "sit[ting] on [her] deformed a[**] all day talking bad about [defendant]" to that person.

She also explained that defendant placed calls to her between June 23 and July 11, 2023, and presented a screenshot from her cell phone voicemail records, showing approximately twenty-four "voice message[s] from the [correctional] facility." Defendant objected to admission of the whole call history and claimed plaintiff could not verify from the document that defendant sent these messages. After plaintiff testified that she entered the prison number into her phone under defendant's name, the court admitted the printed call history, adding that if defendant had reservations, he should "cross-examine . . . plaintiff as to her phone, her methods of doing things, [and] how she registers names in her phone."

In summation, plaintiff argued defendant's history and predicate acts of domestic violence warranted entry of an FRO. Defendant countered that plaintiff failed to establish harassment or actual threats, and did not establish that future restraints were necessary, particularly as defendant was incarcerated.

A-2725-23

Defendant additionally asserted his messages were "protected First Amendment speech" which "can[not] rise to the level necessary for harassment," citing S.B.B. v. L.B.B., 476 N.J. Super. 575 (App. Div. 2023).

## B.

The court's oral decision followed, granting the FRO. Acknowledging plaintiff's evidence and testimony "came in a little convoluted," it otherwise found credible plaintiff's version of the recent communications as well as the parties' prior history. The court stated plaintiff "was prepared to testify, . . . she knew the history between the parties, . . . she presented it in detail, [and] . . . accurately," and further noted her "even[-]toned" and "confident[]" testimony.

Despite rejecting plaintiff's documentation of the cease-and-desist order, the court accepted plaintiff's testimony that the restriction of contact existed, placing the June and July contacts in context. The court found plaintiff established the predicate act of harassment, finding defendant's communications to plaintiff stated "very horrible things" and included "threatening remarks." It read from the text messages and found they reflected "much hostility" toward plaintiff, directing "threatening words and potentially actions to . . . plaintiff."

It also found the string of calls and voicemails reflected an "extensive" number of calls in a short period of time.

Specifically addressing harassment under N.J.S.A. 2C:33-4(a), the court determined that, although not made at "extremely inconvenient hours," "defendant was making contacts to . . . plaintiff with the purpose to harass her," which included language the court found to be "offensively co[a]rse and . . . likely to cause annoyance or alarm." It found "[t]he evidence . . . show[ed] that the phone calls by [defendant] were repeated" and "defendant's actions were clearly, as indicated, to harass . . . plaintiff" and "made to continue the cycle of domestic violence," to "alarm" and "control" plaintiff, and "to make her concerned about her safety and well-being." The court noted plaintiff's proofs also met N.J.S.A. 2C:33-4(c), finding defendant's many contacts with plaintiff in a short span of time satisfied the subsection's requirements. Accordingly, the court found "the predicate act of harassment ha[d] been committed."

Regarding whether plaintiff required future protection, the court found a significant history of domestic violence. Crediting plaintiff's testimony, the court recounted the prior abuse, including the September 2022 assault, finding defendant "choked [plaintiff], head-locked her, [and] threw her to the ground,"

8

resulting in scars depicted in numerous photographs. The court found the previous acts of domestic violence, "[w]hether they were reported or not[,] . . . . did occur."

The court added that the testimony and photographs established plaintiff "was . . . in an abusive relationship, one that the [PDVA] seeks to protect." Despite defendant's incarceration, the court considered plaintiff's safety "when he is no longer incarcerated," expressing that it might be "too late" if the court did not act. Notably, the court found the various acts "were all ways that . . . defendant . . . s[ought] to exercise [coercive] control over [plaintiff]." Additionally, the court noted the testimony "as to instances of the divorce action in essence fueling this action," including "claims [o]f dissipation of assets[ and] changing names on real estate[ and] deeds." It found defendant was "using people on the outside," which supported a finding of defendant attempting to exercise coercive control over plaintiff. The court recognized the importance of wellness checks but found defendant's actions were done "to harass . . . plaintiff, to gain control, [and] to let her know he [wa]s still there." Thus, the court reasoned that the "extensive history of domestic violence between the parties" resulted in "immediate danger to . . . plaintiff [which] must be stopped" regardless of defendant's incarcerated status.

A-2725-23

The court further stated that "[p]eople need to feel safe when they are alone in their homes . . . [and] defendant ha[d] not made plaintiff feel so." Accordingly, the court issued an FRO against defendant "based upon the preponderance of the evidence of not only the history of domestic violence, but . . . the predicate act."

## II.

Defendant appeals, arguing the trial court based its finding of harassment on "insufficient and unreliable evidence," noting the text messages were protected speech, and, like the call history, were "incomplete[,] . . . one-sided," and not properly authenticated. He further contends the trial court erred by finding plaintiff's testimony credible and failing to acknowledge inconsistencies in her testimony. Defendant also asserts the trial court "misapplied the legal standard[] for granting a[n FRO]" and "violated his due process rights." Finally, defendant claims his counsel was deficient and denied him effective assistance of counsel.

## III.

Our review of a trial court's FRO determination is limited. See C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). Importantly, "[w]e accord substantial deference to Family Part judges, who routinely hear domestic

violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" Ibid. (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). The trial court's findings "are binding . . . when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Ibid. (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).

In our review, we "should not disturb the 'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (quoting Rova Farms, 65 N.J. at 484). Conversely, our review of the court's legal conclusions is de novo. See C.C., 463 N.J. Super. at 428-29.

A trial court must engage in a two-step analysis before issuing an FRO. See Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). Initially, "the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A.

2C:25-19(a) has occurred." Ibid. (citing N.J.S.A. 2C:25-29(a)). The court must make this determination "in light of the previous history of violence between the parties." Id. at 125-26 (quoting Cesare, 154 N.J. at 402). Next, "upon a finding of the commission of a predicate act of domestic violence, . . . [the court must determine] whether [it] should enter a restraining order that provides protection for the victim." Id. at 126. The guiding principle of this second inquiry is "whether a restraining order i[s] necessary . . . to protect the victim from an immediate danger or to prevent further abuse." Id. at 127 (citing N.J.S.A. 2C:25-29(b)).

A.

The PDVA protects victims of domestic violence if they experience one of various enumerated acts, including, as alleged here, harassment. See N.J.S.A. 2C:25-19(a)(13). Harassment is defined under N.J.S.A. 2C:33-4 in pertinent part as follows:

> [A] person commits a petty disorderly persons offense if, with purpose to harass another, he [or she]:
>
> > a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;

. . . .

> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

An essential element of harassment, intent to harass, is often difficult to prove by direct evidence, so "'purpose may and often must be inferred from what is said and done and the surrounding circumstances[,]' and '[p]rior conduct and statements may be relevant to and support an inference of purpose.'" R.G. v. R.G., 449 N.J. Super. 208, 226 (App. Div. 2017) (alterations in original) (quoting State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006)). "'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003) (quoting State v. Hoffman, 149 N.J. 564, 577 (1997)).

"[C]ourts must consider the totality of the circumstances to determine whether the harassment statute has been violated." Cesare, 154 N.J. at 404 (citing Hoffman, 149 N.J. at 584-85). "This is particularly true in domestic violence cases in which a cycle of violent behavior is evident." Hoffman, 149 N.J. at 585. Behavior that may not alarm or seriously annoy a non-victim of domestic violence, "may [be] rightly view[ed] . . . as seriously annoying, alarming, or threatening, or as all of those things" by some victims of domestic

13

violence. Id. at 586.

Viewing the record in light of the applicable law, we discern no abuse of discretion in the court's finding the predicate act of harassment. Its determination rested on substantial, credible evidence that was properly admitted into the record.

Having found credible plaintiff's description of the parties' history, including the existence of an out-of-state no-contact order, the court deemed defendant's repeated phone calls and text messages containing offensive and alarming language were directed to plaintiff with a purpose to harass. Specifically, the court determined that the communications were "likely to," and did "cause annoyance or alarm." The court also found the phone calls, occurring "one after the other, within minutes of one another," were "clearly" intended to harass.

Defendant also claims the court erred as his statements were constitutionally protected speech. Although "[v]ulgar name-calling alone is not domestic violence," R.G., 449 N.J. Super. at 226, we are satisfied the court considered the testimony and evidence and viewed the context and content of the messages, calls, and wellness checks, in light of the parties' history, and reasonably inferred an intent to harass, see Castagna, 387 N.J. Super. at 606

14

(determining "purpose may and often must be inferred from what is said and done and the surrounding circumstances"). We discern no error in that finding under either N.J.S.A. 2C:33-4(a) or (c), and agree that defendant's statements were, therefore, not immunized as protected free speech, and his words were instead transformed to harassing communications by defendant's proven intent. See State v. L.C., 283 N.J. Super. 441, 450 (App. Div. 1995) (recognizing N.J.S.A. 2C:33-4 "does not proscribe mere speech, use of language, or other forms of expression," if the purpose to harass is shown).

We similarly perceive no abuse of discretion in the court's evidentiary rulings admitting those statements into evidence. Defendant's contention that the messages were not authenticated and were "incomplete and one-sided," lacks merit. The court admitted the evidence after it was authenticated by plaintiff's testimony, and defendant conceded the authenticity of the text messages.

Defendant's challenge to the admission of the allegedly "incomplete" message chain similarly fails. Indeed, under the rule of completeness, codified in N.J.R.E. 106, a party may seek to admit the whole series of messages in response to plaintiff's admission of only part of their communications. See N.J.R.E. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part, or

any other writing or recorded statement, that in fairness ought to be considered at the same time."); see also State v. Lozada, 257 N.J. Super. 260, 270 (App. Div. 1992) (the rule of completeness is implicated when "[t]he opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding"). Other than generally claiming the messages were incomplete, defendant offered no further messages or testimony to counter plaintiff's messages.

Notably, the court also recognized "there was no cross-examination as to" the document depicting defendant's "roughly [twenty-five] to [thirty]" voicemails, a list it properly considered "extensive," in conjunction with plaintiff's other evidence. The court therefore did not err in admitting the evidence as supported by plaintiff's testimony.

### B.

We likewise consider and reject defendant's claim that the court improperly evaluated prong two of Silver and its relevant factors. See Silver, 387 N.J. Super. at 126. A non-exhaustive list of the factors is codified in N.J.S.A. 2C:25-29(a).

16

Here, the court expressly analyzed each factor and made findings anchored in the record. It recognized and incorporated into its decision the "extensive history of domestic violence between the parties[—]reported, unreported, physical, non-physical, [and] verbal." It found defendant's wellness check calls, voicemails and text messages constituted further attempts "to harass . . . plaintiff, to gain control, [and] to let her know he [wa]s still there," characteristic of "coercive control." The court explained its finding that defendant's incarceration did not minimize the risk of future harm, citing his contacting her from within the facility and enlisting others to act on his behalf. Its concern was not mitigated by the cessation of communications after plaintiff blocked defendant's access, as the court appropriately considered plaintiff's safety upon defendant's release. Thus, we perceive no basis to disturb the court's finding plaintiff required protection from the parties' "abusive relationship, one that the [PDVA] seeks to protect."

## C.

Lastly, we need not address defendant's claim of ineffective assistance of counsel in this civil matter, as claims of ineffective assistance of counsel apply in criminal cases. See Strickland v. Washington, 466 U.S. 667 (1984). Moreover, this issue was raised for the first time on appeal, without a record on

17

which to properly evaluate it.  <u>See</u> <u>Nieder v. Royal Indem. Ins. Co.</u>, 62 N.J. 229, 234-35 (1973).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2725-23