# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2761-20

A.M.B.,

    Plaintiff-Respondent,

v.

E.A.-R.,

    Defendant-Appellant.

_____

Submitted April 4, 2022 – Decided June 27, 2022

Before Judges Rothstadt and Mayer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FV-11-1105-21.

Willie L. Parker, attorney for appellant.

Respondent has not filed a brief.

PER CURIAM

Defendant E.A.-R.[1] appeals from the Family Part's final restraining order (FRO) entered against him under the Prevention of Domestic Violence Act of 1991 (PDVA), N.J.S.A. 2C:25-17 to -35, in favor of plaintiff A.M.B. The FRO was entered after the trial judge concluded that plaintiff proved defendant committed the predicate act of harassment, N.J.S.A. 2C:33-4, and that a restraining order was necessary to protect plaintiff from future acts of domestic violence. On appeal, defendant contends the order must be vacated because the trial judge erred in concluding that plaintiff met her burden of proof and, in the alternative, that an amended FRO should be entered to omit the parties' daughter from the protections afforded by the order because such restraints "directly interferes with a recorded custody order and makes no allocation for defendant to see his daughter."

We affirm the entry of the FRO as we conclude the trial judge's determination was supported by substantial credible evidence. However, we vacate and remand for reconsideration the issue of parenting time because we conclude the trial judge mistakenly deferred it to another court that cannot

---

[1] We use initials for the parties to protect the identity of the victim, consistent with Rule 1:38-3(d)(10).

A-2761-20

consider the issue because of the FRO restraining defendant from having any contact with his daughter.

The facts leading to the entry of the FRO as derived from the record are summarized as follows. Plaintiff and defendant are not married, nor do they reside together. However, they are parents to a daughter who is now nine years old.

On November 30, 2020, plaintiff filed a complaint and application for entry of a temporary restraining order (TRO) against defendant. In her complaint, plaintiff asserted that defendant committed the predicate acts of terroristic threats, N.J.S.A. 2C:12-3, and harassment. Specifically, she alleged that he committed those offenses when, at approximately noon on November 30, 2020, he called "and threatened to punch her in the face." According to plaintiff's complaint, she "received 20[ to ]30 missed phone calls [and] over 100 text messages from def[endant] calling her" various names and otherwise disparaging her. Moreover, according to the complaint, defendant "threatened to call [child welfare authorities] on the pla[intiff] and [to] have people come to her house, knock down her door and hurt [her], their daughter, pla[intiff's] son and her fiancé." Last, she asserted that "def[endant] tried to fight pla[intiff's] fiancé."

Plaintiff's complaint also alleged prior reported and unreported acts of domestic violence. Specifically, it referred to a prior complaint that had been dismissed in which plaintiff alleged that "def[endant] . . . pushed pla[intiff], threatened to pistol whip her, punch her in [her] face and threatened to send people after her." The complaint also alleged that in the past "def[endant] had called [child welfare authorities twenty] times in one year [and he had demonstrated a] history of calling and harassing pla[intiff] on and off over [three] years." It also alleged that in the past "def[endant] ha[d] pushed himself into [her] home and show[ed] up at her house unannounced knocking on the door and entering without pla[intiff's] permission."

Evidently, prior to the trial, in February 2021, plaintiff's complaint was inadvertently administratively dismissed by the court. The parties were notified of the dismissal and within minutes of finding out, defendant resumed his contact with plaintiff. Plaintiff responded by filing a new complaint and securing a new TRO.

The matter was then brought to trial on April 22, 2021.[2] At the hearing, both parties were represented by counsel. The only witnesses were the two parties.

In her testimony, plaintiff explained the parties' relationship, confirming that they had a daughter, were not married, and had never resided together. Plaintiff then described events that occurred recently in February 2021, within minutes of learning her November complaint had been dismissed. These events were evidently included in her February 2021 complaint.

Plaintiff stated that defendant called and texted her and their young daughter in an effort to see the child even though there "was a snowstorm [and] nobody could go anywhere." According to plaintiff, because she was not responding to defendant in a "timely manner," he contacted child welfare authorities and began to repeatedly contact plaintiff.

---

[2] Defendant's appendix does not contain a copy of the February complaint and TRO filed under the docket number in this action. He only included the complaint filed in November 2020 under docket number FV-11-000796-21. The failure to include that pleading in his appendix is a violation of Rule 2:6-1(a)(1)(A). See Soc'y Hill Condo. Ass'n, Inc. v. Soc'y Hill Assocs., 347 N.J. Super. 163, 177 (App. Div. 2002). At a minimum, the failure to provide the pleading hampers our appellate review and would warrant our dismissal of the appeal. We choose however to address defendant's contentions on the limited record.

Plaintiff asserted that defendant's contacting child welfare services was nothing new. He had "continuously" done so for at least sixty to eighty times in the past. Each time he did, his claims would be investigated, and the matter would be dropped because none of his allegations were substantiated.

Turning to the complaint and TRO entered in November, plaintiff described the events that led to her seeking relief from the court at that time. According to plaintiff, in the "[f]our days leading up to" the entry of the TRO, the two were "continuously arguing." These arguments occurred "[o]ver the phone, in person and text messages." Plaintiff testified that he contacted her "every single day and texted her" thirty-one times in a row in a three-minute span to argue over "whatever argument he chooses."

Plaintiff also explained that when she learned that the restraining order had been "dropped," she was and had always been "fearful." She claimed that defendant's actions were directed towards upsetting her and making her "unhappy, to bother [her] to make [her] feel like giving up."

During plaintiff's testimony, copies of multiple pages of text messages were produced and admitted into evidence.[3] According to plaintiff, the four pages of text messages were from November 2020. There were thirty-two texts

---

[3] These documents were also not included in defendant's appendix.

within a two-to-three-minute span and, according to plaintiff, this occurred on a "constant" basis, "every single day." Moreover, plaintiff testified that defendant contacted her via text repeatedly despite the existence of a restraining order.

Plaintiff also asserted that she required a restraining order because of the "constant messages," his coming to her house repeatedly "to argue with" her, and then "call[ing] the police," which caused her great distress. As plaintiff described the events, she indicated that she was "shaking" during her testimony and because of his conduct "at night [she] barricade[s her] door with a chair and [she has had] security cameras [installed] in [her] home and outside of" it as well "because [she is] fearful that [defendant] will follow up on his threats to send people to [her] house and just come and harm [her] because this is what he says he[ is] going to do."

Plaintiff also described defendant's threats to fight with her fiancé and to strike her. She "[a]bsolutely" believed that defendant was capable of doing so "[b]ecause [she] kn[ew] that he [has] a firearm and he served in the Navy . . . so . . . he knows how to use a gun." The fact that defendant had a weapon and was capable of using it made plaintiff "[e]xtremely fearful." She specifically stated she "fear[ed] for [her] safety."

A-2761-20

When defendant testified, he stated that the TRO was issued in February only after he called plaintiff once and called and texted his daughter once. He denied constantly sending plaintiff texts.

Defendant justified his contacts with child welfare authorities by claiming that they were based upon learning from his daughter's school principal that his child "missed about two months of [virtual] school." He believed that plaintiff obtained the restraining order after becoming upset about his finding out their daughter was not attending school. He attributed all of his conduct to the fact that he is "a concerned parent."

Defendant admitted calling child welfare authorities maybe "three or four times, maybe five" about the child not attending school. In fact, according to defendant, plaintiff had been "sent . . . to truancy court a couple of times." He stated, "I've been dealing with this for a few years now and that's the only reason that I'm getting restraining orders on me. This happened . . . last year and it . . . happened this year all because she[ is] missing school."

Defendant confirmed that he had contacted those authorities "a couple of times" because he also believed that plaintiff used pain killing medication and, in fact, asked him to procure some for her. According to defendant, plaintiff

A-2761-20

sought the restraining order only because he had contacted the child welfare authorities.

As to plaintiff's other allegations, defendant explained why he showed up unannounced at plaintiff's home. According to defendant, he went to plaintiff's home "a couple of times when [his] daughter [had not] been in school" because plaintiff told him that he could "come to [her] house any time." Although he initially denied that he "ever pushed in [plaintiff's] door," he later conceded to knocking on her door for forty minutes, and when plaintiff did not respond, defendant entered plaintiff's home.

Defendant denied ever threatening to get into a fight with plaintiff's fiancé but confirmed that the three of them got into arguments about defendant not accepting that his daughter was not attending school. Defendant also denied ever threatening to strike plaintiff and owning a firearm. He denied making any inquiries about plaintiff's personal life.

On cross-examination, defendant explained that prior to their daughter being in school he was contacting child welfare services about plaintiff's "drug use [and the child] constantly smelling like cigarettes." Once she started school, he would be contacting the authorities "every year" because there was an issue of the child not attending school.

9

Defendant was then asked to review the pages of text messages that were admitted into evidence. He confirmed that there were twenty-six text messages within a six-minute period on one day. He justified the use of the pejorative and vulgar language in those text again by relying upon his belief that his child was not attending school. He confirmed that one of the texts described him "pulling up" to plaintiff's home and stating to plaintiff that she had "a big problem on her hands," and that he was "done playing."

After defendant completed his testimony, the judge placed his decision on the record. The judge first found that the plaintiff established jurisdiction by virtue of the parties' relationship as co-parents as provided under the PDVA. The judge then turned to whether the plaintiff "demonstrated by a preponderance of the evidence the requisite predicate acts of domestic violence." First, the judge considered defendant's actions on February 18, 2021, upon the dismissal of the November TRO. He found that defendant started calling plaintiff's phone within thirteen minutes after that dismissal, and then started to call the daughter's phone as well. He also found that defendant made calls to the New Jersey Division of Child Protection and Permanency (DCPP) over fifty times in the past two years. And, he repeatedly "tr[ied] to integrate himself into the plaintiff's life."

The judge was also satisfied that "plaintiff [was] afraid of the defendant." The judge specifically relied upon the fact that plaintiff had "many security cameras in her home because the plaintiff is so scared of the defendant."

The judge found plaintiff's testimony was credible. On the other hand, he found that defendant's credibility "to be certainly an issue here." He was convinced that plaintiff not only testified truthfully but that she was "very frightened." The judge specifically reviewed the factors to be considered by the trier of fact in determining credibility and concluded that he was "convinced by all of those standard typical measures that this is a . . . woman that is frightened and fearful."

The judge observed that the texts sent by defendant that were admitted into evidence were "replete, consistent, and repetitive in their use of vulgar, inappropriate, [and] profane language." According to the judge, defendant did not "dispute numerically the extraordinary number of [DCPP] referrals made." Nor did he deny going to plaintiff's house unannounced. He viewed defendant's justification for his own actions as a "disproportionate response to the differentiation of opinion regarding the importance of school."

A-2761-20

Turning to the predicate act, the judge found that only harassment was asserted.[4] He reviewed the elements of that offense, and concluded that based on his "credibility determinations," he was "confident that the plaintiff [had] indeed met her burden of proof [and] burden of persuasion."

The judge found defendant's justification for his actions to be unnecessarily harmful to plaintiff and their child and observed that it was highlighted by defendants "rant[s] of profane la[d]en barrage[s] of text that are partly intelligible, partly unintelligible."

Having determined that defendant's intentional acts constituted the predicate act of harassment, the judge turned to the issue of whether there was a need to enter an FRO in order to protect plaintiff. He then stated the following:

> [G]iven the sheer number, the frequency after that phone call came in, [about the TRO being dismissed,] the . . . dispatch with which this defendant contacted DCPP . . . and what occurred thereafter the extraordinary number of text in a very short period of time, both intelligible and unintelligible all relatively profane, it certainly indicates that there is a . . . need to protect this [plaintiff] from further acts of domestic violence . . . the defendant has threatened to punch her in the past, has threatened her in the past . . . so the defendant's history of domestic violence, the reported number of recorded acts certainly support [plaintiff] . . . asserting that she is fearful of the

---

[4] We assume that the judge was referring to the February 2021 complaint in this action that was not included in defendant's appendix.

defendant. She is fearful. She has multiple cameras set up in her house. I am confident that she is fearful and confident that . . . the second prong of the [Silver[5]] test has certainly been established here.

The judge concluded that a FRO was required under the present circumstances. In issuing his order, he restrained defendant from having contact with plaintiff, her fiancé, plaintiff's son, and the parties' daughter "at this juncture." The FRO awarded plaintiff temporary custody of their daughter, and in his oral decision, he added that "any issues of custody should be addressed under the . . . existing docket . . . in the Superior Court."[6] This appeal followed.

As a threshold matter, we acknowledge the scope of our review of a judge's decision to issue an FRO is limited. "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). Such "[d]eference is especially appropriate 'when the evidence is

---

[5] Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006).

[6] Included in defendant's appendix is a copy of an order entered on March 1, 2018, under a "FD" docket addressing the support, custody, and parenting time of the parties' daughter.

largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). As such, we will not disturb the factual findings of the trial judge unless they are so "manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." C.C., 463 N.J. Super. at 428 (quoting S.D. v. M.J.R., 415 N.J. Super. 417, 429 (App. Div. 2010)). We do, however, review the trial judge's legal conclusions de novo. Elrom v. Elrom, 439 N.J. Super. 424, 433-34 (App. Div. 2015) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

The New Jersey Legislature enacted the PDVA "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18. In determining whether to issue an FRO under the PDVA, the court must perform a two-step analysis. Silver, 387 N.J. Super. at 125-26. "First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. The trial court should make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402).

Second, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to (6), to protect the victim from an immediate danger <u>or to prevent further abuse</u>." <u>Id.</u> at 127 (emphasis added). Those factors include, but are not limited to: "[t]he previous history of domestic violence between the [parties], including threats, harassment and physical abuse," N.J.S.A. 2C:25-29(a)(1), and "[t]he best interests of the victim," N.J.S.A. 2C:25-29(a)(4). Governed by these principles, we address defendant's contentions.

The judge here determined that defendant committed the predicate act of harassment. Under N.J.S.A. 2C:33-4,

> a person commits a petty disorderly persons offense [of harassment,] if, with purpose to harass another, he [or she]:
>
> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

A-2761-20

A "'finding of a purpose to harass may be inferred from the evidence presented,' and we have observed that '[c]ommon sense and experience may inform that determination.'" J.D., 207 N.J. at 477 (alteration in original) (quoting State v. Hoffman, 149 N.J. 564, 577 (1997)). Our Supreme Court has construed "'any other course of alarming conduct' and 'acts with purpose to alarm or seriously annoy' as repeated communications directed at a person that reasonably put that person in fear for his [or her] safety or security or that intolerably interfere with that person's reasonable expectation of privacy." State v. Burkert, 231 N.J. 257, 284-85 (2017).

In the present matter, the trial judge considered the extensive testimony adduced at the domestic violence trial and fully assessed the credibility of the parties. Having reviewed the record, we conclude that there was sufficient credible evidence supporting the trial judge's determination that defendant committed the predicate act of harassment under subsections (a) and (c).

As the trial judge concluded, defendant committed acts of harassment based on the frequency and content of his repeated text messages, telephone calls, threats, and appearing unannounced at plaintiff's home. The judge also found that defendant's text messages used offensively coarse language in a manner likely to cause annoyance or alarm. The judge also found that the

16

messages had been sent deliberately with the purpose to harass plaintiff. Those findings satisfy the elements of harassment under subsections (a) and (c). See N.J.S.A. 2C:33-4(a) and (c).

Under the totality of the circumstances, and in view of the domestic violence history recognized by the judge, the frequency, volume, and crude content of those messages support a finding of harassment. See N.B. v. S.K., 435 N.J. Super. 298, 307 (App. Div. 2014); see also Hoffman, 149 N.J. at 577 (recognizing defendant's "purpose to harass may be inferred from the evidence presented"); Pazienza v. Camarata, 381 N.J. Super. 173, 183-84 (App. Div. 2005). That conclusion was bolstered by defendant's voluminous and evidently unsubstantiated allegations made to DCPP that plaintiff was subjecting the parties' daughter to a risk of harm. See Hoffman, 149 N.J. at 577 ("Absent a legitimate purpose behind defendant's actions, the trial court could reasonably infer that defendant acted with the purpose to harass [plaintiff].").

We also conclude that there was credible evidence supporting the judge's finding that plaintiff needed a restraining order. The judge credited plaintiff's testimony concerning her fear of defendant, the instances of domestic violence, and the actions already taken by plaintiff—such as installing security cameras— to try to protect herself from harm. Accordingly, we find that the judge's

determination that a FRO in favor of plaintiff was necessary to protect her from further abuse by defendant was supported by sufficient evidence in the record that established both prongs needed for a FRO.  See Silver, 387 N.J. Super. at 125-27.

We are not persuaded otherwise by defendant's challenge on appeal to the trial judge's credibility determinations.  See D.C. v. F.R., 286 N.J. Super. 589, 601 (App. Div. 1996) ("We are obliged to accord special deference to those findings which were substantially influenced by the judge's opportunity to hear and see the witnesses and to have the 'feel' of the case, which an appellate reviewing court does not enjoy.").  Nor do we accept his justification for his conduct, claiming that it was so that he could ensure his daughter was in school and later to ensure that he could resume parenting time.  To the extent defendant believed he had legitimate concerns about his daughter in plaintiff's custody or was subjected to unwarranted interference with his parenting time, there were remedies he could have pursued under the parties' existing action under the FD docket rather than employing repeated acts of harassment intended to yield plaintiff's compliance with defendant's wishes, including repeated calls to DCPP.

Although we agree that a FRO was necessary here, we part company with the trial judge as to his decision to enter a restraining order against defendant having contact with his daughter and also directing defendant to seek relief in the FD action. As defendant correctly points out on appeal, a court in the FD action will not permit any contact while the FRO is in place. Consequently, the trial judge incorrectly withheld his discretion when he did not make a determination on parenting time and instead, determined that "[a]ny issues of custody should be addressed under the . . . existing [FD] docket addressing custody and visitation issues." For that reason, we are constrained to remand the matter to the trial judge in this action to reconsider and address issues relating to parenting time.[7] However, by our remand, we do not imply one way or another whether the FRO should be modified and parenting time allowed.

---

[7] Our conclusion is supported by the policies and procedures for domestic violence cases promulgated by our Supreme Court, which state the following:

> In processing an FV case where there is an existing FD case, the following provisions of the FD manual shall be employed:

> If there exists a previous FD order addressing custody/parenting time and/or child support, prior to the filing of a domestic violence action, that order shall be preserved under the FD docket. The FD court file must be forwarded to the judge hearing the FRO or

Affirmed in part; reversed and remanded in part for further proceedings consistent with our opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

continued TRO for review and <u>any necessary adjustments should be made to the FD order to ensure conflicting orders do not exist.</u>  The FD order shall be referenced in the FV order to ensure all affected parties, divisions and agencies are aware of the multiple orders. <u>The FD file shall be joined to the FV file for as long as the FV case is active</u>. . . .

   a.   Modifying the Concurrent FD order**:** When any party wishes to file for a modification of the FD order during the life of the domestic violence restraining order, <u>that case must be heard by the domestic violence judge</u>. . . .

[Supreme Court of N.J. & Attorney Gen. of N.J., <u>New Jersey Domestic Violence Procedures Manual</u>, 87 (2022), https://www.njcourts.gov/courts/assets/family/ dvprcman.pdf?c=Bhe. (Emphasis added).]

A-2761-20