# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3390-22

M.L.R.,

    Plaintiff-Respondent,

v.

J.R.R.,

    Defendant-Appellant.

_____

        Argued September 12, 2024 – Decided September 20, 2024

        Before Judges Mawla and Vinci.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FV-03-1808-23.

        Mark J. Molz argued the cause for appellant.

        Respondent has not filed a brief.

PER CURIAM

Defendant J.R.R.[1] appeals from the June 14, 2023 final restraining order (FRO) entered against him and in favor of plaintiff M.L.R. pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35 (PDVA). Following our review of the record and applicable legal principles, we affirm.

The parties are married but separated and living apart. On April 16, 2023, plaintiff filed a domestic violence complaint alleging assault and harassment and was granted a temporary restraining order (TRO). On May 5, 2023, an amended TRO was entered. On May 17 and June 14, 2023, the court conducted a trial on plaintiff's application for an FRO. Plaintiff, her co-worker K.F., and defendant testified at trial.

Plaintiff testified that on April 16, 2023, defendant struck her in the face in the parking lot of the store where she works. According to plaintiff, she exited the store with K.F. at approximately 6:00 p.m. because she and K.F. were on a meal break and going out for food. Plaintiff shares an apartment with K.F., but denied they were involved in any type of relationship. Plaintiff saw defendant sitting in his car parked several cars away from her car. As she was walking to her car, defendant's "window was down" and he was "screaming and yelling and spitting." He was "enraged and he was just screaming [at] the top of his lungs"

---

[1] We utilize initials to protect the confidentiality of the parties. R. 1:38-3(d)(9).

and "cursing." Defendant was calling K.F. a "child molester and calling him names . . . ."

Before plaintiff reached her car, defendant moved his car and positioned it behind plaintiff's car and "blocked [her] in" so she "could[ not] get out[ of] the parking lot." After several minutes, defendant exited his vehicle and continued "yelling" and "shouting" at K.F. Defendant then "got into [the] driver's seat of [plaintiff's] car." While defendant was in her car, plaintiff moved defendant's car into a parking spot, so it was no longer blocking her in.

As plaintiff walked back to her car, she saw defendant "in the console in between both the driver and passenger seat . . . looking for something" and then "he reached over to the glove compartment pulling out what [she] had . . . ." When plaintiff reached the side of the car, she "asked him to stop throwing things around, asked him to get out of [her] car. And he just kept cursing and just kept looking for whatever he was looking for and screaming and yelling."

Plaintiff testified "when he was . . . moving and throwing things . . . in the car, he punched [her]" in the chin. "He was rootin[g] through papers and stuff. And then when he stopped, . . . [they] were back and forth yelling and then . . . he turned around. That[ is] when he hit [her]." Plaintiff experienced "[s]oreness" for "about an hour" after the incident.

3

Plaintiff admitted that at approximately 4:00 p.m. that day, during a fifteen-minute break, she left work and went to defendant's residence to obtain prescription pain medication from him.  She denied defendant's claim that she engaged in sexual activity with him that afternoon.

Plaintiff testified that on a prior occasion in 2021, while she was still living with defendant, K.F. drove her home from work and defendant "came towards [them] as [she] was trying to come out of the car . . . screaming, cursing[,] and spitting."  After plaintiff entered the house, defendant "came into the house yelling at [her] in [her] face."  He followed her "into the bedroom and cornered [her] . . . and then . . . put his hands around [her] throat . . . ." Defendant "pushed [her] up against the wall and started cursing at [her]. And . . . that's when he hit [her]."  Plaintiff broke free and went to the police station.  Plaintiff also testified "on Christmas of 2021," after defendant had an argument with her daughter, defendant "was talking about killing and shooting" and said "he would put a bullet in [plaintiff's] head and he would kill [her]."

K.F. testified that on April 16, 2023, when he and plaintiff exited the store, defendant's car was "parked sideways blocking [plaintiff's] vehicle from coming out."  While defendant was still in his car, there was "a lot of shouting going on," plaintiff and defendant "were going back and forth," and "at one point,

4

[K.F.] got spit at." Defendant said K.F. "was go[ing] to get shot by a person named [N…]."

According to K.F., after "a good couple [of] minutes" defendant "got out of his car and jumped in [plaintiff's] car." After plaintiff moved defendant's car, "[s]he was asking him to get out [of] the car. And he swung at her." K.F. saw defendant swing but did not see if he hit plaintiff's face. K.F. then "came around . . . the vehicle" into the passenger seat and grabbed defendant's hand "as a restraint" to stop him from swinging at plaintiff again.

K.F. also testified that on one occasion in 2021, he drove plaintiff home from work. Defendant approached K.F. and "asked [him] if [he] was sleeping with his wife." According to K.F., after plaintiff exited his car and "was walking to the house, . . . [defendant] spit at her."

Defendant testified and denied hitting plaintiff. According to defendant, he went to the store to meet plaintiff because they were planning to go out for dinner. Earlier that afternoon, when plaintiff came to his home to obtain his prescription pain medication, they had "a good conversation" and "husband and wife relations." According to defendant, while plaintiff was driving back to work, she called and told "[him] to go to [] dinner at 6:00. To meet her by the car. [He] went there to pick her up."

5

Defendant testified plaintiff exited the store and started to get into defendant's car when K.F. "came out and [plaintiff and K.F.] started exchanging words and started yelling." Defendant claimed K.F. "came up to the side of [his] window screaming and yelling" and said he was "sleeping with [defendant's] wife." Defendant explained:

> [W]hen [K.F.] said that[,] [defendant] got upset, got out of [his] car . . . because . . . [he] [was] there for two reasons, [they] were going to go to [dinner] and also . . . after she left[,] the mail came and new insurance cards came. So [he] wanted to give her the new insurance card and that [is] what [he] wanted to do.
>
> And then when [K.F.] said that to [him][,] [he] got upset, got out of the car, and just wanted to get . . . the old insurance card, give her the new one and when [he] got out of the car [plaintiff] took off in [his] car . . . and also there[ is] a tracker, a device for the . . . cars and [he] needed to mail that back to the insurance company . . . .

Prior to April 16, defendant "did[ not] trust [that] [K.F.] was [plaintiff's] roommate. Something in [his] gut said he was[ not], but [thirty] something years is worth trying to fix, but that day [he] found out it[ is] not." Defendant testified he "knew that day that they had relations. [He] found out that day that it was true." Defendant testified he "got in the car to grab [] the tracker" and because he is a double amputee and needed a place to sit after plaintiff moved his car.

6

After defendant entered plaintiff's car, K.F. "came in the passenger door" and "grabbed [defendant's] four fingers and pulled [him] across . . . the center console . . . ." Defendant claimed plaintiff was also "grabbing" and "pinching" him and then scratched his neck and knocked his glasses off. Defendant does not "remember hitting [plaintiff] at all. If [his] hand was open, [he] was grabbing the door frame."

Text messages defendant introduced as evidence at trial indicated he went to the store to confront plaintiff and "talk eye to eye" to question her about K.F. In one message, defendant wrote, "[M.L.R.], good bye, whore." He admitted that was him "talking to [his] wife disrespectfully."

Defendant recalled the incident in 2021 when K.F. drove plaintiff home from work. He conceded he "got mad" because he saw plaintiff lean over and kiss K.F. in the car. Defendant testified he followed plaintiff up the stairs in the house and when he "got up to the top of the stairs, she came bolting out of the bathroom" and "[he] did grab her shoulder and the wall to catch [his] balance and then she took off to the police station."

Applying the two-step analysis set forth in Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006), the court found defendant committed the predicate acts of offensive touching harassment, N.J.S.A. 2C:33-4(b), and assault,

7

N.J.S.A. 2C:12-1(a).  The court also determined an FRO was necessary to protect plaintiff against future acts of domestic violence.

The court found plaintiff and K.F. credible, stating:

> The question is whether . . . the blow was struck.
> . . . .
> And . . . the question is whether [K.F.] is to be believed.  [K.F.] has no stake in this . . . litigation for the [c]ourt found him to be forthright as . . . he did not attempt to embellish his testimony and . . . of great significance is that he said, '[he] saw the fist thrown by [defendant]. [He] did[ not] see whether it made contact.'
>
> Clearly [K.F. and plaintiff] did[ not] get together and plot their testimony to make it as favorable as possible for [her].  So . . . the [c]ourt does conclude that there . . . was a punch thrown and accepts [plaintiff's] testimony . . . that she was struck.

Also, there were "reasons why the [c]ourt [was] not inclined to accept [defendant's] testimony that . . . there was no blow thrown."  The court noted defendant initially testified he did not "remember hitting her" and found "the entire context of the case supports the likelihood that [defendant] would throw a punch at [plaintiff]."  Specifically, the court concluded defendant was "troubled about the relationship between [plaintiff] and [K.F.] and it weigh[ed] heavily on his mind" leading the court to "easily conclude that it was what provoked him to throw the punch."

A-3390-22

Applying the second prong of <u>Silver</u>, the court found, based on the testimony of plaintiff and K.F. regarding the incidents in 2021 which the court found credible, and the incident on April 16, 2023, this "is a long festering thing for" defendant. Based on all of these incidents, the court was not satisfied that "when [defendant] becomes angry . . . he would not strike out against [plaintiff] again."

On appeal, defendant argues: (1) plaintiff failed to meet her burden under <u>Silver</u>; and (2) the court erred by finding a predicate act occurred. Specifically, defendant argues the court did not find defendant acted with the purpose to harass plaintiff and an FRO is not necessary because plaintiff did not testify she is afraid of defendant.

Our scope of review is limited when considering an FRO issued by the Family Part. <u>See</u> <u>D.N. v. K.M.</u>, 429 N.J. Super. 592, 596 (App. Div. 2013). We will "grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." <u>Ibid.</u> (citing <u>Cesare v. Cesare</u>, 154 N.J. 394, 411-12 (1998)). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, [and] credible evidence." <u>Cesare</u>, 154 N.J. at 411-12. Deference is particularly appropriate

9

"where the evidence is largely testimonial" and hinges upon a court's ability to make assessments of credibility. Id. at 412. We review de novo the court's conclusions of law. S.D. v. M.J.R., 415 N.J. Super. 417, 430 (App. Div. 2010).

The entry of an FRO requires the trial court to make certain findings, pursuant to a two-step analysis. See Silver, 387 N.J. Super. at 125-27. "First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. The trial court should make this determination "'in light of the previous history of violence between the parties.'" Ibid. (quoting Cesare, 154 N.J. at 402).

Second, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6),[2] to protect the victim from an immediate danger or to prevent

---

[2] The six factors are:

> (1) [t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment, and physical abuse; (2) [t]he existence of immediate danger to person or property; (3) [t]he financial circumstances of the plaintiff and defendant; (4) [t]he best interests of the victim and any child; (5) [i]n determining custody and parenting time the protection of the victim's safety; and (6) [t]he existence

further abuse." Id. at 127 (citing N.J.S.A. 2C:25-29(b) (stating, "[i]n proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse")); see also J.D. v. M.D.F., 207 N.J. 458, 476 (2011). While the second prong inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the [applicable] factors . . . to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127.

A person commits offensive touching harassment if, with purpose to harass another, the person, "[s]ubjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so . . . ." N.J.S.A. 2C:33-4(b). "'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003) (quoting State v. Hoffman, 149 N.J. 564, 577 (1997)).

A person is guilty of assault if the person, "[a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another . . . ."

---

of a verifiable order of protection from another jurisdiction.

[N.J.S.A. 2C:25-29(a)(1)-(6).]

N.J.S.A. 2C:12-1(a)(1). "'Bodily injury' is defined as 'physical pain, illness or any impairment of physical condition.'" State ex rel. S.B., 333 N.J. Super. 236, 242 (App. Div. 2000) (quoting N.J.S.A. 2C:11-1(a)). "'Not much is required to show bodily injury. For example, the stinging sensation caused by a slap is adequate to support an assault.'" State v. Stull, 403 N.J. Super. 501, 505 (App. Div. 2008) (quoting N.B. v. T.B., 297 N.J. Super. 35, 43 (App. Div. 1997)).

Pursuant to these principles, we affirm substantially for the reasons set forth in the court's oral opinion. We conclude there is no basis to disturb the court's factual findings or legal conclusions. The court had the opportunity to hear and consider the testimony of the witnesses and assess their credibility. The court's factual findings are supported by substantial, credible evidence, and those facts were correctly applied to the law.

Defendant's contention that plaintiff did not prove a predicate act lacks merit. The court found, based on the credible testimony of plaintiff and K.F., that defendant intentionally struck plaintiff in the face. That finding is plainly sufficient to establish the predicate acts of offensive touching harassment and assault.

Defendant's argument that the court erred in determining an FRO is necessary to prevent future acts of domestic violence is not convincing. After

12

considering all the evidence presented regarding the incidents on April 16, 2023, and in 2021, the court was not satisfied defendant "would not strike . . . [plaintiff] again." "At its core, the [PDVA] effectuates the notion that the victim of domestic violence is entitled to be left alone. To be left alone is, in essence, the basic protection the law seeks to assure these victims." Hoffman, 149 N.J. at 584. The substantial, credible evidence in the record reflects that the entry of the FRO achieved this goal.

To the extent we have not addressed any remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION