# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3729-22

A.S.,

    Plaintiff-Respondent,

v.

S.A.,

    Defendant-Appellant.

_____

> Submitted September 12, 2024 – Decided September 30, 2024
>
> Before Judges Berdote Byrne and Jacobs.
>
> On appeal from the Superior Court of New Jersey, Law Division, Family Part, Camden County, Docket No. FV-04-3168-23.
>
> S.A., appellant pro se.
>
> Respondent has not filed a brief.

PER CURIAM

    Defendant, S.A., appeals from a June 20, 2023 final restraining order (FRO) entered under the Prevention of Domestic Violence Act (PDVA),

N.J.S.A. 2C:25-17 to -35, based on predicate acts of harassment, N.J.S.A. 2C:33-4, and stalking, N.J.S.A. 2C:12-10.[1] For reasons that follow, we affirm.

I.

The parties to this action are daughter and mother. On April 19, 2023, plaintiff, A.S., contacted the Cherry Hill Police Department, complaining that defendant, her mother, had falsely reported her as a missing person and called the police at other times to instigate groundless "wellness checks." Plaintiff also related that her mother followed her on a trip to Tampa, Florida, appeared uninvited at her hotel, surreptitiously accessed her financial accounts, and attempted to enter her Manhattan apartment without permission. Based on these recollected incidents, a municipal court judge authorized issuance of a temporary restraining order (TRO) listing harassment as a predicate offense.

On April 26, 2023, in application to obtain an amended TRO, plaintiff expanded on the history of domestic violence. Specifically, plaintiff described how defendant accessed her bank and credit card accounts to learn of her travel plans. After discovering plaintiff planned a trip to Australia in late December 2022 with a long-term boyfriend who her mother disfavored, defendant

---

[1] We refer to the individual involved in this appeal by initials to protect her privacy. See R. 1:38-3(c)(9).

A-3729-22

contacted the New York City Police Department, reporting that her daughter was at risk of self-harm. Acting on that report, the NYPD detained and transported plaintiff to a psychiatric unit at Mount Sinai Hospital, where she remained for over six hours before being cleared for release. Because of the delay occasioned by involuntary hospitalization, plaintiff cancelled her travel plans. On the heels of that cancellation, she then planned a trip to Portugal in early January 2023, again in the company of her boyfriend, D.S. Through surreptitious means, defendant learned of plaintiff's itinerary. When plaintiff arrived in Lisbon, she was met by Portuguese authorities, who had been told by her mother that she was "being forced to travel against [her] will by [her] partner." Besides these incidents, plaintiff listed six separate occasions when defendant parked outside of her Manhattan apartment building and monitored her, even donning a wig on one occasion to avoid detection. On another occasion, defendant prompted police to conduct a "welfare check" at 7:30 a.m. Based on the foregoing, a Superior Court judge authorized issuance of an amended TRO to include stalking, in addition to harassment, as a predicate offense.

As proceedings began on June 20, 2023, defendant's counsel of record told the court that his client had terminated his services. Defendant confirmed this representation:

> THE COURT: You want to represent yourself in this matter?
>
> DEFENDANT: Yes, yes[.] I sent a termination letter of his services. I strongly feel I could represent myself better. He's not familiar with my case[.] He's very busy with other cases. So please allow myself to represent myself today.

After further questioning and assurances from defendant that she was indeed ready to proceed, the court commenced trial. First to testify was Sergeant James Shields of the Cherry Hill Police Department. Sergeant Shields recounted that defendant called on December 26, 2022, reporting that "her daughter was in danger." She called on multiple other occasions with the same concern. In response, the police contacted plaintiff to check on her welfare. On the third occasion, plaintiff asked that the police "cease contacting her" for that purpose.

Sergeant Shields' next contact with the parties came on April 19, 2023, when plaintiff completed forms necessary to request a TRO. Once the TRO was granted, Shields served it on defendant at her listed Cherry Hill address. On cross-examination, defendant did not challenge the substance of Shields'

testimony, except to elicit that he did not "have a problem with any of the calls [defendant] was making."

Plaintiff's testimony followed. She recounted the predicate acts and history in reverse chronological order. Plaintiff detailed how her trip to Tampa in April 2023 was disrupted when her mother unexpectedly appeared at the hotel where she was staying and tried to persuade her to leave D.S. She perceived her mother's surprise appearance and actions as an escalation of her prior acts of domestic violence. Fearing for her personal safety, plaintiff reported the encounter to the Tampa Police Department. Upon her return to New Jersey, she contacted the Cherry Hill Police Department, which provided guidance to obtain a TRO.

Plaintiff also recounted a trip to Portugal in January 2023, where she was contacted by embassy officials at her mother's behest. This was followed by defendant's numerous appearances at plaintiff's apartment. Plaintiff's attorney sent defendant a cease-and-desist letter and a supplemental letter revoking a power of attorney she had previously conferred to defendant. Plaintiff also testified how her intended trip to Australia was derailed in December 2022. She recalled that her mother even contacted members of D.S.'s family in effort to sabotage their romantic relationship.

5

Defendant learned of yet another trip to Bangkok in September 2022. In that instance, defendant contacted the United States embassy, reporting her daughter "was going to be shot or killed or worse." Thai embassy officials contacted plaintiff, asking her to sign a waiver to release information about her whereabouts to defendant.

At the conclusion of plaintiff's testimony, her attorney asked:

> COUNSEL: [W]hat are you asking the Court to do today?
>
> PLAINTIFF: I would like the FRO entered. I also am asking the Court to order a mental health evaluation because I do believe there is a deep history and you know, very critical, untreated, mental health issues here[,] and for her to be required to comply with the recommendations.

On cross-examination, defendant impressed upon her daughter that in the event she obtained an FRO, contact with her father would also be adversely affected. Through leading questions, defendant attempted to minimize the nature of her conduct, stressing that plaintiff's apartment building was "a high rise with 5,000 people in it," suggesting an innocuous basis for her presence. Defendant asked her daughter to concede that on only one occasion did she actually enter plaintiff's apartment, for the purpose of bringing Christmas gifts. Plaintiff sidestepped this invited concession, instead maintaining her allegations that defendant parked outside the building, that her presence had been video

6

recorded by the building's doorman, and that plaintiff herself had witnessed defendant and her father "with my own eyes, many times outside my building."

In her direct testimony, defendant pointed to her age (sixty-eight), "long-standing tenure[d] faculty member" at a university, love for her only child, and genuine belief that her daughter "has been manipulated" by D.S. Defendant denied having any intent to harass her daughter, "[n]o matter what actions [she] took in the past." Citing the subject statute, she argued, "even assuming that all of the allegations contained in the temporary restraining order and amended restraining order are true, . . . they fail to establish prima facie act of . . . harassment, pursuant to N.J.S.A. 2C:33-4 . . . ." She also challenged the court's jurisdiction, claiming not to have been at her Cherry Hill residence when the TRO was served, but was instead in Florida on the date in question and did not return until "late at night, late in the afternoon."

Defendant presented pictures to buttress her contention that her relationship with her daughter was "loving, healthy[,] and respectful," deteriorating only after her daughter moved in with her boyfriend during the Covid pandemic. The boyfriend's religion, she stated, "doesn't allow him to live with a non-Jewish woman like my daughter." She testified to becoming "interested in Judaism. I (indiscernible) almost a rabbi, myself, okay? We

7

support our daughter to date or marry anyone she likes in her life[,] but we have concerns. We don't want our daughter to get involved in violating other people's religious law." She continued, "[w]e want to support [D.S.] to move forward, move on with his own Orthodox Jewish life and marriage without worrying about our daughter, as long as he could allow my daughter to be free."

Defendant conceded she and her husband travelled to Tampa, not to intercept her daughter, but instead to "see whether in the future we can buy a house . . . or a second home." She acknowledged contacting authorities in Portugal, explaining that she was motivated by concern for her daughter's safety in the company of D.S. She also acknowledged wearing a wig on one occasion when she travelled to her daughter's apartment in Manhattan. Because elderly East Asian people were being attacked in New York early in the pandemic, "our friend suggested wear wigs, okay, for safety and also [to] look younger."

In making its findings of fact and conclusions of law, the trial court said:

> I find this [c]ourt has jurisdiction over this matter. It's clear the parties have a family relationship[,] being daughter and mother[,] and this [c]ourt has jurisdiction. One of the ways this [c]ourt can obtain jurisdiction is the residence of either the [p]laintiff or the [d]efendant. It's clear, as you testified to ma'am, that you live in Cherry Hill, New Jersey, which is in Camden County.

Having found legal jurisdiction, the court continued, speaking to defendant:

> [Y]ou've just admitted to every single act of harassment that was alleged in the temporary restraining order.

Finding plaintiff's testimony credible, the court recited the elements of harassment (N.J.S.A. 2C:33-4) and found:

> These are not typical activities of an adult. [Plaintiff] has the right to have some freedoms in her life. It's clear that this is harassment. The amount of times that you admitted yourself to doing this is disconcerting to this Court . . . there was also stalking.

As to stalking (N.J.S.A. 2C:12-10), the court found:

> On two separate occasions, you testified that - - perhaps three separate occasions. That first, you sat in a car out front of her building in New York. This was your testimony[,] and you did that because you wanted to be able to see her. That fits the definition of stalking.
>
> So it's clear that there are at least two predicate acts that have been found in this matter.

The court added:

> Incidentally, your daughter is 27 years old. She's not a child. She is – not only is she an adult[,] but she is also a Wharton [g]raduate . . . I'm also sure that she feels it is necessary to do this so she can live a life free of being harassed and being – every time she goes anywhere, there is a wellness check or she is getting stopped at the airport[,] or her boyfriend is being detained at the airport.

Having found defendant committed predicate acts of harassment and stalking, the court then determined that entry of an FRO was necessary "for the safety of the [p]laintiff" and prohibited defendant from having any further contact with her daughter or D.S.

Concerning a psychiatric evaluation, the court ruled:

> You have – not only have tried to track them down and have wellness checks[,] but also have them detained at the airport. This is not what a rational person typically does. So I do have concern[,] as has also been asserted by the [p]laintiff[,] that there is a need for a psychiatric evaluation. So I'm entering that provision in there as well . . . I do think it is important that a psychiatric evaluation be conducted in this matter.

## II.

On appeal, defendant presents the following arguments:

> Point 1: The TRO was wrongly issued on April 19, 2023 because the Cherry Hill Municipal Court and the Camden Superior Court had no jurisdiction over the allegations listed in the TRO[,] even though there was no single element of domestic violence in the allegations. Also, the Court had no jurisdiction over the two parties because the plaintiff daughter has lived in NYC since 2019[,] while I, the defendant mother[,] no longer lived in New Jersey at the time of the TRO issued but has [sic] lived in Pennsylvania, 120 miles away from my daughter. (Raised below)
>
> Point 2: There was no factual legal basis for the Court to enter the TRO on April 19, 2023 because the

allegations presented no immediate danger or any danger from the loving mother to the plaintiff, my only child but my love and care for her life safety and her health and her well[-]being due to the dangerous situation she has involved with her previous partner without her realizing it. (Raised below)

Point 3: The Camden Superior Court of New Jersey violated my legal right to due process of law by depriving my legal right to appeal the wrongly issued TRO[,] by making up a false reason that the previous TRO appeal application was denied [. . . .] (Raised below)[]

Point 4: The trial court violated my right to due process of law at the FRO hearing. (Raised below)

Point 5: The trial court abused the discretion and erred in granting the final restraining order with psychiatric evaluation without reviewing and considering any evidence and testimonies from me, the mother of the deceived plaintiff daughter [A.S] and my witness, [], the father of [A.S.]. (Raised below)

Point 6: The trial court erred in entering the FRO with psychiatric evaluation without applying the law correctly. The NJ harassment statue N.J.S.A. 2C: 33-4 requires that the act is "with purpose to harass ..." which is just the contrary to our intent ([plaintiff]'s mother and father) was to protect and save the life and health of our deceived, missing and isolated daughter, not harass same. (Raised below)

Point 7: The trial court Judge got the facts wrong that were not what the parties testified to during the hearing. He made mistakes in his findings and got the law wrong which resulted in his biased and unjustified decisions which has made our mentally sick and deceived

11

daughter homeless[,] endangering her life. (Raised below)

Our standard of review in domestic violence matters is circumscribed. We defer to the trial judge's factual findings unless they are shown to be not reasonably supported by the record and thus "'clearly mistaken'" or so "'wide of the mark'" as to result in a denial of justice. C.M.F. v. R.G.F., 418 N.J. Super. 396, 401-02 (App. Div. 2011) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). We must accord considerable weight to the trial judge's findings of credibility. Cesare v. Cesare, 154 N.J. 394, 412 (1998). We owe special deference to the expertise of the Family Part in making often difficult judgments about the lives of families and children. See E.P., 196 N.J. at 104; Cesare, 154 N.J. at 413.

Jurisdiction

For provisions of the PDVA to apply, the court must first have subject matter and personal jurisdiction. Here, the trial court properly found both forms of jurisdiction. It had subject matter jurisdiction based on the familial relationship between the parties and persistent calls by defendant to the Cherry Hill Police Department to conduct welfare checks of plaintiff, among other predicate acts. See N.J.S.A. 2C:25-19d. It had personal jurisdiction based on defendant's residence in Camden County. N.J.S.A. 2C:25-28a. This latter

12

finding was supported by testimony from Sergeant Shields and plaintiff, both of whom testified that defendant maintained a residence in Cherry Hill during the time of the subject predicate acts. There is nothing in the record to support defendant's newly raised contention that she lived in Pennsylvania rather than Cherry Hill at the time of the incidents or on the date of service. Accordingly, we reject defendant's jurisdictional arguments contained in points one and two.

History of Domestic Violence and Predicate Acts

In defendant's third and seventh points, she challenges the sufficiency of the evidence that resulted in the temporary and final restraining orders based on allegations of harassment and stalking. "Domestic violence" means an occurrence of one or more of the fourteen specific criminal acts inflicted upon a person protected by the Act. N.J.S.A. 2C:25-19(a). Among those fourteen specified criminal acts is harassment and stalking. A person commits an act of harassment when, "with purpose to alarm or seriously annoy such other person," the actor "makes, or causes to be made, one or more communications . . . at extremely inconvenient hours . . . or any other manner likely to cause annoyance or alarm." N.J.S.A. 2C:33-4(a), (c). "A finding of a purpose to harass may be inferred from the evidence presented." State v. Hoffman, 149 N.J. 564, 577 (1997).

Instigating baseless repeated welfare checks constitutes harassment, as the trial court found. A party's purported loving, well-intended motivation for initiating such action is not a legal justification for what amounts to an unhealthy need to control and dominate the life of another. As the Supreme Court has observed, "[o]ur law is particularly solicitous of victims of domestic violence . . . . At its core, the [PDVA] effectuates the notion that the victim of domestic violence is entitled to be left alone. To be left alone is, in essence, the basic protection the law seeks to assure these victims." Hoffman, 149 N.J. at 584 (citations omitted). More than once, plaintiff made clear her wish to be left alone; yet defendant regularly and consciously disregarded that wish. In finding defendant engaged in conduct constituting harassment, the trial court did not abuse its discretion.

A person is guilty of stalking when they "purposefully or knowingly engage in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress." A "course of conduct" under the statute includes:

> repeatedly [on two or more occasions] maintaining a visual or physical proximity to a person; directly, indirectly, or through third parties, by any action, method, device, or means, following, monitoring, observing, surveilling, threatening, or communicating to or about, a person, or interfering with a person's

property; repeatedly committing harassment against a
person . . . .

Here, as the trial court found, all the elements of the offense were met, extending also to reasonable fear for the safety of D.S., a romantically-linked third party. A review of the record confirms that defendant personally surveilled plaintiff at her apartment or caused third parties (police and diplomatic officials) to monitor her daughter. While defendant at times tried to portray her conduct as innocuous – being in Tampa by happenstance or wearing a wig out of fear for her safety – defendant acknowledged engaging in the predicate conduct.

In her fourth point, defendant claims a due process violation without an attendant referent. We see nothing in the record that would pertain to a due process concern, including defendant's independent, if improvident, decision to proceed without counsel. Due process mandates that litigants have "a meaningful opportunity to defend against a complaint in domestic violence matters, which would include the opportunity to seek legal representation, if requested." D.N. v. K.M., 429 N.J. Super. 592, 606 (App. Div. 2013) (citing Franklin v. Sloskey, 385 N.J. Super. 534, 540-41 (App. Div. 2006)), certif. denied, 216 N.J. 587 (2014). The protection of a defendant's due process rights in the domestic violence context requires a fact-sensitive

15

analysis. <u>Ibid.</u> Here, the record shows defendant had retained counsel who appeared and asked to be relieved based upon defendant's wish that he not represent her. Further, the record evidences that defendant's decision to proceed without her retained counsel was knowing and voluntary. There was no feature of this case that would implicate a due process violation.

In sum, the trial court relied on substantial reliable evidence to make its factual findings and legal conclusions in entry of an FRO. Defendant's justification, while nominally motivated by concern for a loved one, was correctly found by the trial court to be misguided and "irrational."

<u>Psychiatric Evaluation</u>

Upon entering an FRO, the trial court stated, "I do have concern[,] as has been also asserted by the [p]laintiff, that there is a need for a psychiatric evaluation. So[,] I'm entering that provision in there as well." The irrational nature of defendant's purported defense and testimony congruently gave rise to the court's decision to order a psychiatric evaluation by a court-selected mental health professional. The PDVA provides, "the court may require the defendant to receive professional counsel from either a private source or a source appointed by the court, and if the court so orders, the court shall require the defendant to provide documentation of attendance at the professional

16

counseling." N.J.S.A. 2C:25-27(a). Based on defendant's alarming behavior in the record before us, the court acted reasonably and within its authority to require defendant be evaluated by a professional psychiatrist.

Defendant's remaining arguments do not merit discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3729-22