# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1605-23

K.J.,

    Plaintiff-Respondent,

v.

R.U.,

    Defendant-Appellant.

_____

        Submitted May 19, 2025 – Decided May 29, 2025

        Before Judges Gummer and Jablonski.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-1120-24.

        Colasurdo Law LLC, attorneys for appellant (Vito Colasurdo, Jr., on the briefs).

        Hovanec & Divito, LLC, attorneys for respondent (Marisa Lepore Hovanec, on the brief).

PER CURIAM

Defendant R.U. appeals from a final restraining order (FRO), which was entered pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.[1] Defendant argues the trial judge erred and violated his due-process rights in finding defendant had committed the predicate act of harassment. Unpersuaded by those arguments, we affirm.

I.

The parties met in 2019 and lived together for about nine months after their daughter was born in 2020. Plaintiff testified they had separated on September 24, 2020, "after [she] was physically and viciously beaten and attacked by [defendant]."

On September 20, 2023, plaintiff obtained a temporary restraining order (TRO) against defendant. That day, she filed a domestic-violence complaint in which "harassment" was checked as the criminal offense at issue. In the complaint, plaintiff described an incident that had taken place during the evening of the previous day. According to plaintiff, a prior court order required the parties conduct the parenting-time "exchange" of their child in a police-department parking lot. Plaintiff alleged that during the exchange that

---

[1] We use initials to protect the confidentiality of the participants in these proceedings. R. 1:38-3(d)(10).

evening, their child ran to her and "while [plaintiff] was walking away from [defendant] with minor, [defendant] grabbed [plaintiff] and attempted to [sic] minor child from [plaintiff]." Plaintiff also alleged defendant "was elbowing [plaintiff] to grab minor child" and "[plaintiff] began to run towards the station and [defendant] gave chase." According to plaintiff, she ran into the station, and police officers gave her "a complaint and referred her to family court for a TRO."

The complaint form asked if the parties had any prior history of domestic violence, either reported or unreported. Plaintiff responded "yes" and provided the following information: "while the[y] lived together, [defendant] would break items in the home. . . . [Defendant] sat on [plaintiff's] chest. . . . [W]hen minor child was [six] months old, [defendant] beat [plaintiff] badly. [Defendant] was intoxicated. . . . [Defendant] was controlling."

On November 29, 2023, plaintiff amended the complaint, and the court issued an amended TRO. "Assault" was the only box checked as the criminal offense at issue. Regarding the September 19, 2023 incident, plaintiff further alleged defendant had "elbowed [her] in the chest, neck, and face. The incident resulted in injury to [her] shoulder and left arm." Plaintiff also added allegations regarding two prior incidents of domestic violence. According to plaintiff, on

3

August 17, 2020, she locked herself and the parties' child in a room "to get away" from defendant, whom she described as "drunk," "paranoid," and "in a rage." Plaintiff alleged defendant "tried bashing down [the] door, whilst screaming [and] threatening [her]. Another drunken rage night, he accused [her] of cheating, threw [her] on bed, sat on [her] chest [and] neck, [she] couldn't breathe." According to plaintiff, on the morning of September 24, 2020, when defendant "was intoxicated and extremely angry":

> He came after [her] while [their six-month-old child] was in [her] arms. [Defendant] viciously started beating [her], punching [her] with closed fist. Threw [her] around the room like a rag doll. Pulled chunks of [her] hair out. He punched [her] all over [her] body and was throwing furniture and anything he could get at [her]. [She] was screaming, begging him to stop. [She] thought he was going to kill [her].

On December 1, 2023, a judge conducted a trial on plaintiff's application for an FRO. The parties were both represented by counsel.

Plaintiff testified about the September 19, 2023 incident alleged in the complaint and amended complaint. According to plaintiff, that evening she went to the police-department parking lot to meet defendant for the exchange of their child consistent with the court order. She was accompanied by her former boyfriend, E.K., and their son. She exited her car and saw defendant take their daughter out of his car, say goodbye to her, hug her, and place her on the ground.

4

According to plaintiff, defendant "might have said something about like school or something." The child ran towards plaintiff. Plaintiff picked her up and turned to walk back to her car, with her back facing defendant. Plaintiff testified about what happened next:

> [A]ll of a sudden out of nowhere I just felt a grab, like a tug. Like my left arm was grabbed hard and viciously, just hurt. And then my shoulder, it felt almost like a grab on my arm and then my shoulder, and pulled me backward, like strong. Like just all of a sudden just out of nowhere. I had no idea what was happening. I just kept kicking back. And then all of a sudden he's –
>
> . . . .
>
> behind me and getting in front of me and trying – I don't – he's not saying anything. He just had that look in his eyes.
>
> . . . .
>
> His eyes looked black. Just – he looked like he was just out of control completely, which I've seen before. And he [was] just strong-arming me. Absolutely just – his elbows [were] elbowing my chest, my neck, my face. He was just – almost like he's put – pulling his – so that he can grab at my daughter, which he ended up putting his arms around her face, and at one point trying to like pull her face away from me while like trying to push me away. . . . I had no idea what he was trying to do.
>
> So I'm screaming as soon as he grabbed. I'm like "[R.] stop! Stop touching me! Don't touch me! [R.], stop please!" And . . . [my daughter] was in my arms, too, which really scared me because she started crying

5

as soon as he started pulling on her head. And obviously because her mommy is sitting there, you know, like screaming at him to get off of me, she started crying, and she had to see all that.

According to plaintiff, defendant "let go" after E.K. and their son exited her car. Plaintiff immediately went to the police station. She testified she "was scared out of [her] mind" and "thought he was coming after [her] again, even when [she] started running into the police station."

Plaintiff testified about the pain she had felt in her left arm when defendant grabbed her. She described two photographs she had taken four to five days later that showed a bruise on her arm.

Plaintiff also testified about prior incidents of defendant's domestic violence toward her. She testified about an incident in July 2020 when she had called the police after defendant came through a window to take her phone out of her hand. Defendant's counsel objected to the testimony about the July 2020 incident because it was not referenced in the complaint or amended complaint. She testified about an August 2020 incident in which defendant had punched through the locked door of plaintiff's bedroom, where she had gone in an attempt to separate herself and their child from him because he was in a "drunken rage." She testified about an incident in September 2020 in which plaintiff again tried to separate herself from defendant because he was drunk and they were arguing.

6

According to plaintiff, defendant followed her, threw her on a bed, and sat on top of her chest to the point she could not breathe and was starting to lose consciousness.

Plaintiff testified about the September 24, 2020 incident. According to plaintiff, defendant, who was drunk, "had [her] up all night fighting." To get away from defendant and "clear [her] head," plaintiff left the house. She came home about two hours later, at which point defendant immediately met her at her car, started screaming at her, and accused her of cheating on him. When they entered the house, defendant "start[ed] beating" her and hurling things at her. He "threw [her] around the room by [her] hair," pulling out "chunks" of it. He repeatedly punched her and slammed her on the floor. Plaintiff identified several photographs she had taken of the injuries she said she sustained in that incident. She also identified several photographs she had taken of damage defendant inflicted on her car that morning.

Plaintiff said she felt "deathly afraid" of defendant, and even more so after the September 19, 2023 incident. She expressed concern about what defendant would do "if there's a real thing that happens," considering how he had treated her during a non-confrontational, routine custody exchange when she was

7

holding their child. Plaintiff testified she believed she was in danger and that defendant was "very capable of" hurting her again and would hurt her again.

E.K. testified about the September 19, 2023 incident. According to E.K., plaintiff picked up the parties' child and "[defendant] grabbed her from the back." He testified:

> I saw [defendant] like almost like go into like a bear hug like thing, like not like a hug, but you know, just grab like the two of them. I saw his hand on [the child]'s face and a hand over on [plaintiff]'s arm, in like – in a weird, like aggressive way.

He described plaintiff as then being in a "state of panic."

Defendant testified about the September 19, 2023 incident. According to defendant, plaintiff walked over to his car as he was unbuckling their child from the car seat. He described plaintiff as being "very angry," "upset," and "aggressive." Plaintiff told him she would be at their child's back-to-school-night event the next night and that he was welcome to come. He told plaintiff she had to give him forty-eight hours of advance notice about school activities under their agreement. Plaintiff disagreed. Defendant described what happened next:

> I leaned in to kiss [the child], and [plaintiff] did not like that. She pulled [the child] away. I placed my hand on her shoulder. I tried to lean in to kiss her, and it didn't happen, so immediately she became infuriated, and she

-- she said, "[R.], are you insane?  You're not allowed to touch me."  And immediately I exited the situation. I walked back to my car.

Defendant recorded the incident on audio on his phone.  The audio recording was played in court and admitted into evidence.  The recording began with a discussion between defendant and the child about the planets and then about surprising plaintiff.

> DEFENDANT:  No, no, no.  We're not going to scare her right now because she already knows we're here.  So we're just going to get your backpack and give me a kiss and a hug, okay?  Then you're going to go to mom, okay?  I'll miss you.  And daddy loves you.
>
> [THE CHILD]:  Mommy!
>
> PLAINTIFF:  (squealing) Hi!
>
> [THE CHILD]:  I can see you.
>
> DEFENDANT:  Oh, here's your backpack.
>
> PLAINTIFF:  Come on baby. You're so beautiful.
>
> [THE CHILD]:  Mommy!
>
> DEFENDANT:  Okay, sweetie pie.
>
> [THE CHILD]:  I need them, I need them, I need them.
>
> DEFENDANT:  All right.  You've got to bring back your sweatshirt tomorrow, okay?
>
> [THE CHILD]:  Okay.

9

A-1605-23

DEFENDANT:  Give me a kiss.

[THE CHILD]:  Mommy!  Mommy!

PLAINTIFF:  Is that Peppa thing in there?

DEFENDANT:  What?

PLAINTIFF:  Her Peppa cup?

DEFENDANT:  Oh, it's in the bag.

PLAINTIFF: Okay.  Thank you.  She's going to school and I'll be there too to go to back-to-school night.

DEFENDANT:  Yeah, but you should have told me about that [forty-eight] hours in advance as per our agreement.

PLAINTIFF:  What are you talking about?

DEFENDANT:  Anything that has to do with school, you have to tell me about it.

PLAINTIFF:  . . . [R.], actually that's not true, because you called the school to get emails and I had to confirm it, actually.

DEFENDANT:  Read the agreement.  Read the agreement.

PLAINTIFF:  You called the school to get all of the updates.

DEFENDANT:  I love you, sweetie.

PLAINTIFF:  Don't touch me!  [R.]!

A-1605-23

DEFENDANT:  Okay.

PLAINTIFF:  Are you insane?

DEFENDANT:  You guys, be more careful, okay? Don't be rude.  See you later.

PLAINTIFF:  You're not allowed to touch me.  Are you insane?

DEFENDANT:  See you later, Boo Bear.

According to defendant, he attempted to kiss the child's forehead because he felt he had not had a chance to say a "proper goodbye" and had not yet kissed her goodbye.  Defendant testified he had his hand on the back of the child's head while he was trying to kiss her and plaintiff "didn't want that to happen" and "kept pulling [the child] . . . stretching her neck."  Defendant then "placed [his] hand" on plaintiff's shoulder to kiss the child goodbye.

When asked if he had hit plaintiff in the past, defendant admitted they had had "an altercation in 2020."  He did not deny he had caused bruises to plaintiff in the past.  Regarding the September 19, 2023 incident, defendant testified he did not intend to harm or frighten plaintiff or to cause a disturbance.

On December 20, 2023, the court granted plaintiff's application, issued the FRO, and placed a decision on the record.  At the beginning of the decision, the court stated, "the alleged predicate acts in this matter are assault and

11

harassment . . . ."  Neither party objected to that characterization.  The court found plaintiff "to be a more credible witness" and "question[ed] the defendant's credibility."  The court also found E.K. was credible.

The court held defendant's testimony was not supported by the audio recording of the September 19, 2023 incident.  Based on the recording, the court rejected defendant's testimony that plaintiff was angry when their exchange began and that he had not already kissed their child goodbye when he placed his hand on plaintiff.  The court found:

> When asked why he approached [plaintiff], and in his words touched her shoulder, in her words grabbed her arm, he said he wanted to give his daughter a kiss goodbye.
>
> Having listened to that audio over and over again, I counted not one but two moments where he kissed her goodbye.  His alleging that he did not kiss her goodbye before that time is simply not credible.  It's not supported by the evidence.  He said he kissed her goodbye to his -- he gave her a kiss goodbye, gave her her backpack, kissed her goodbye again, and sent her to her mother, presumably a few steps away.  His accounting of the incident is not credible in light of the audio-recording that he submitted in evidence.

The court found incredible defendant's testimony that he merely put his hand on plaintiff's shoulder and credible plaintiff's testimony that he had grabbed her left arm.

A-1605-23

The court held plaintiff had not established the predicate act of assault.

The court found:

> To prove assault, the plaintiff must prove that the defendant attempted – and I believe the only section, the applicable section, is Section 1, attempted to cause or purposely, knowingly, or recklessly caused bodily injury to the plaintiff. That's Subsection 1 of [N.J.S.A. 2C:]12-1.
>
> . . . .
>
> I'm acknowledging that . . . not much is required to show bodily injury, but it still must be demonstrated that the physical action that caused the bodily injury was purposely, knowing or reckless.
>
> [Defendant] grabbed the arm of the plaintiff to apparently stop her or turn her so that he could allegedly kiss his daughter again. A little bit of this is unclear. I don't have a video. The [c]ourt simply can't make a finding that the grabbing of the arm was purposeful or knowingly or recklessly the thing that caused this event, the injury to the plaintiff based on this record. I know he touched her. I just don't know exactly where, and if that bruise was caused by his touching her on the arm. But I am making a finding that he touched her.
>
> But there would have to be more intention to [defendant]'s actions. It's clear he grabbed the arm, but the inconsistency in the testimony as to the actual injury, combined with some question as to the intent of the touching, does not rise to a level where the [c]ourt can consider [defendant]'s actions assault as per the statute.

13

[(Emphasis added).]

The court held plaintiff had established the predicate act of harassment.

The court found:

> There's no question in this court's mind that the elements of N.J.S.A. [2C:33-4(b)] have been met in this record. The defendant, who already had a tenuous relationship with the plaintiff . . . touched the plaintiff for no apparent reason. And . . . he put his hands on her, something I would expect he would not venture to do, causing her to be concerned for her own well-being and safety. You can hear her reaction on the audio-recording. She was not reacting to nothing.
>
> The court does not find [defendant] credible with respect to why he would touch her. He kissed the daughter twice before the point which he testified he wanted to kiss her. His behavior was characterized by [the judge who had issued the TRO] when she first heard the story as bizarre, with no legitimate purpose, and the court concurs. There was no legitimate purpose to his touching her on that day.
>
> In some sort of reaction to what he was thinking or feeling, he grabbed her somewhere on her arm with no words in an aggressive manner. There's no question in the court's mind that this is subjecting another to offensive touching pursuant to N.J.S.A. 2C:33-4(b). Plaintiff has met her burden of proving harassment and [p]rong [one] of Silver [v. Silver, 387 N.J. Super. 112 (App. Div. 2006)].
>
> [(Emphasis added).]

Analyzing the second prong of Silver, the court stated, "I feel that there is a lapse of judgment. [Defendant] lost some sort of control. This causes me concern because of the location, because of where they were, because of the history in this matter." The court found "there is some sort of a danger to the plaintiff as they move forward," concluded plaintiff had established prong two of Silver, and issued the FRO. The court issued an amended FRO on January 26, 2024, addressing parenting-time issues.

On appeal, defendant argues the court erred in entering an FRO based on the predicate act of harassment. He contends that in finding harassment, the court deprived him of his due-process rights because the harassment box was not checked on the amended TRO. He also contends "the court's own findings show that defendant did not act purposely when touching plaintiff." We disagree and affirm.

## II.

The scope of our review is limited in an appeal involving an FRO issued after a bench trial. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between

couples.'" Ibid. (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)); see also T.B. v. I.W., 479 N.J. Super. 404, 412 (App. Div. 2024) (same). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)); see also T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12; see also Gnall v. Gnall, 222 N.J. 414, 428 (2015).

We defer to a trial judge's factual findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)); see also C.C., 463 N.J. Super. at 428. We defer to a trial judge's credibility determinations. Gnall, 222 N.J. at 428. We review de novo a trial judge's legal conclusions. C.C., 463 N.J. Super. at 429.

The entry of an FRO under the PDVA requires the trial court to make certain findings pursuant to a two-pronged analysis set forth in Silver, 387 N.J. Super. at 125-27. Under the first prong, the court "must determine whether the

16

plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)). Assault, N.J.S.A. 2C:12-1, and harassment, N.J.S.A. 2C:33-4, are among the predicate acts included in N.J.S.A. 2C:25-19(a). See N.J.S.A. 2C:25-19(a)(2), (13).

A person commits an assault when he or she "[a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another." N.J.S.A. 2C:12-1(a)(1). "Bodily injury" is defined as "physical pain, illness or any impairment of physical condition." N.J.S.A. 2C:11-1(a). "A simple assault requires the intent to cause bodily injury." R.G. v. R.G., 449 N.J. Super. 208, 228 (App. Div. 2017). A person commits harassment,

> if, with purpose to harass another, he:
>
> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4(a) to (c).]

Defendant asserts in his merits brief that the predicate act of harassment "was never pled." In making that assertion, he fails to recognize harassment was expressly pleaded in the initial complaint. And the factual allegations set forth in the initial complaint were repeated, not omitted, in the amended complaint.

We recognize it is "improper to base a finding of domestic violence upon acts or a course of conduct not even mentioned in the complaint." L.D. v. W.D., 327 N.J. Super. 1, 4 (App. Div 1999). But that's not what happened here. The judge's finding of harassment was based on the evidence presented at trial, and that evidence was consistent with the factual allegations set forth in the amended complaint. And defendant does not contend otherwise. Plaintiff's testimony about the July 2020 incident was the only evidence presented at trial that went beyond the factual allegations of plaintiff's pleadings to which defendant objected. The court did not grant the FRO based on the July 2020 incident; it didn't even reference it in its opinion.

When the court began its decision by stating "the alleged predicate acts in this matter are assault and harassment," no one objected or in any way attempted to correct the court -- a clear indication both sides understood what predicate acts were at issue. Even if viewed as an amendment to the pleadings, it is well settled that a trial court's "broad power of amendment should be liberally

exercised at any stage of the proceedings, including on remand after appeal, unless undue prejudice would result." Kernan v. One Wash. Park Urban Renewal Assocs., 154 N.J. 437, 457 (1998) (quoting Pressler, Current N.J. Court Rules, cmt. on R. 4:9-1 (1998)). An amendment would not impose undue burden or be unfair to a defendant where the original and new "claims are based on closely related factual allegations." Coastal Grp., Inc. v. Dryvit Sys., Inc., 274 N.J. Super. 171, 181 (App. Div. 1994); see also Jersey City v. Hague, 18 N.J. 584, 602 (1955) ("Broad power of amendment is contemplated by the rules . . . at any stage of proceedings, and is permitted except when justice to a party prejudiced thereby requires that it be forbidden.").

After the court rendered its decision, defense counsel did not move to re-open the case to present evidence or argument regarding the finding of harassment. On appeal, defendant contends generally that had the harassment box been checked on the amended complaint form, he would have "tried the case in a different fashion," asserting "[t]he questions would have been different." But he does not state what would have been different. He has not identified any additional witness he would have called, evidence he would have presented, testimony he would have given, questions he would have asked, or trial strategy

19

he would have employed had the "harassment" box been checked on both complaint forms.

On this record and considering the court's harassment finding was based on facts that were both alleged in the amended complaint and supported by evidence presented at trial, we do not perceive any undue prejudice or due-process violation. Cf. J.D., 207 N.J. at 469, 479-82 (finding trial court violated pro se defendant's due-process rights by not adjourning the trial when he said he "really wasn't prepared" to address plaintiff's testimony adding to the prior history of domestic violence alleged in the complaint); H.E.S. v. J.C.S., 175 N.J. 309, 324 (2003) (finding trial court violated defendant's due-process rights when it denied his adjournment request after plaintiff had testified about a domestic-violence incident not alleged in the complaint and granted an FRO based on that newly-asserted incident); L.D., 327 N.J. Super. at 4 (reversing an FRO when "[m]uch of the testimony was outside the four corners of plaintiff's domestic violence complaint").

"The purpose to be served by enactment of the harassment statute [was] to make criminal, private annoyances that are not entitled to constitutional protection." State v. Hoffman, 149 N.J. 564, 576 (1997). "Harassment requires the defendant act with the purpose of harassing the victim." D.M.R. v. M.K.G.,

20

467 N.J. Super. 308, 323 (App. Div. 2021). "A finding of a purpose to harass may be inferred from the evidence presented." Hoffman, 149 N.J. at 577. "Common sense and experience may inform that determination." Ibid.; see also D.M.R., 467 N.J. Super. at 323. "Absent a legitimate purpose behind defendant's actions, [a] trial court could reasonably infer that defendant acted with the purpose to harass . . . ." Hoffman, 149 N.J. at 577.

And that's exactly what the trial court did here. The court carefully considered defendant's testimony that he had touched plaintiff so he could kiss his daughter goodbye. The court found that testimony not credible because the audio recording defendant had produced demonstrated he already had kissed the child twice before he touched plaintiff. Considering the parties' history – which included defendant's non-denial of hitting plaintiff in the past – and "tenuous" relationship, the court concluded "[t]here was no legitimate purpose to his touching her on that day." Given defendant's incredible assertion he had touched plaintiff to kiss their child goodbye and the utter lack of a legitimate purpose to putting his hand on her, the court reasonably inferred defendant acted with the purpose to harass plaintiff.

Because the court did not err in finding the predicate act of harassment and did not violate defendant's due-process rights in reaching that finding, we affirm.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1605-23